Nos. 80,106
80,753

STATE OF KANSAS, *Appellee*, v. FRANK F. RUCKER, JR., *Appellant.*
(987 P.2d 1080)

Opinion filed July 16, 1999.

*Elizabeth Seale Cateforis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Doyle Baker*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Frank F. Rucker, Jr., appeals his jury convictions of aggravated indecent liberties with a child, K.S.A. 21-3504(a)(2)(A), a severity level 3 person felony, and stalking, K.S.A. 21-3438(a), a severity level 10 person felony.

Rucker raised four issues, contending that (1) the trial court abused its discretion in denying his request for a psychological evaluation of the alleged victim, (2) evidence that he had allegedly similarly sexually abused another child was erroneously admitted, (3) K.S.A. 21-3438 is unconstitutionally vague and violated his Sixth and Fourteenth Amendment rights, and (4) there was insufficient evidence to support the conviction of stalking.

We affirm both convictions. We hold the trial court did not abuse its discretion in denying the psychological evaluation, evidence that Rucker had similarly sexually abused another child was properly

admitted pursuant to K.S.A. 60-455, the stalking statute, K.S.A. 21-3438, is constitutional, and there was sufficient evidence to support the stalking conviction.

*Factual Background*

Although 31 witnesses testified for the State, we need not detail all of the sordid facts because the appellant does not question the existence of sufficient evidence to support the jury's determination of guilt for the charge of aggravated indecent liberties with a child. We will present only those facts necessary to address Rucker's claims of error.

Frank Rucker and his wife, Kathy Rucker, had a stormy relationship from the time they met in 1985 through late March 1997 when this prosecution began. The relationship began in Wichita but faltered when Kathy returned to North Carolina and became pregnant with C.N.R. by a third party. It was reestablished when she returned to Wichita and resumed living with Rucker when C.N.R. was born in 1986. Rucker signed C.N.R.'s birth certificate, and the three of them lived together for a short time.

At some point, Rucker and Kathy married, although Kathy was not yet divorced from her first husband. A paternity action was filed where the trial court determined that it was in C.N.R.'s best interest that Rucker be determined to be her "presumed father." Rucker and Kathy's relationship was contentious, and they constantly battled over physical abuse, visitation, and child support. Their custody of C.N.R. was shared, with C.N.R. living with Kathy during the week and with Rucker on the weekends.

Immediately prior to his arrest on March 28, 1997, the parties had been obtaining court orders—Kathy's to protect her from abuse and Rucker's to obtain visitation. When Rucker attempted to enforce his visitation rights, C.N.R. told her mother that Rucker had been sexually abusing her and that she did not want to go with him. C.N.R. was taken to a hospital for a physical examination and then to a children's home.

At trial, the State was permitted to present evidence that Rucker had allegedly sexually abused another daughter, S.R., from his pre-

vious marriage to C.H. This evidence was introduced through the testimony of the victim, S.R., her sister, K.T., and C.H.

K.T. testified she had witnessed Rucker abusing her sister, S.R., on several occasions when K.T. was 9 or 10 years old and S.R. was 12 years old. K.T. testified that, while watching television, S.R. was called to help her mother and was told by Rucker, "Pull your panties up and get in there." On another occasion, K.T. remembered seeing Rucker on top of S.R. "moving back and forth." On another occasion K.T. awoke because the bunkbed she shared with S.R. was creaking and K.T. saw Rucker's face. K.T. also remembered a family vacation where she saw her father abuse her sister.

K.T. admitted on cross-examination that she did not report her sister's abuse until some 15 years after it occurred. She had tried to file a complaint, but was told that she could not do so because she was not the victim. She said she kept silent because she was scared of Rucker and had never talked to her sister about the abuse. She admitted that after she told her mother, her sister denied the abuse had occurred.

K.T. testified that as C.N.R. grew older she noticed a change in her behavior and became concerned that her father might be sexually abusing her, just as he had S.R. K.T. wrote of her concerns in a letter to a counselor in 1992, but when questioned, C.N.R. denied any abuse had occurred.

S.R. testified that Rucker had sexually abused her from the time she was 5 years old until she was 13 years old. She remembered being sexually abused by him when she was in kindergarten and that "it was introduced to [her] as sort of like a game, something that daddies did with their little girls, something that was acceptable." She said she was told not to "tell, [that her] mother wouldn't like it, [and] that [she would] get in a lot of trouble."

S.R. testified the abuse progressed when she was 8 or 9 years old to her being made to lie on the bed without any clothing as Rucker rubbed his penis against her, touched her inappropriately, and tried to make her kiss him; sometimes Rucker looked at pornographic magazines while doing this. S.R. testified that he would force her to lie down, rub against her, and usually ejaculated onto

her stomach or pubic area, and after he was finished, he would tell her to "go get cleaned up."

S.R. recalled that Rucker would apply a yellow lotion to her before he would rub against her and recalled being fondled under a blanket and being abused while on a family vacation. If she cried or complained, Rucker would slap her and he threatened to kill "Shoo Shoo," the family dog, to which she was very attached, should she tell anyone about the abuse.

S.R. testified Rucker stopped sexually abusing her when she began menstruating, about age 13. She explained at trial, "I was still naive enough not to connect the pregnancy thing that he probably was concerned about." S.R. testified that Rucker never inserted his penis into her vagina; rather, he rubbed it on her vaginal area.

S.R. admitted on cross-examination that when she was asked by her mother whether Rucker had abused her, she "denied it or told her [she] didn't want to talk about it." She also stated she has never spoken to her sister K.T. regarding the abuse.

C.N.R. testified that Rucker started abusing her when she was 4 or 5 years old. Rucker would enter her bedroom, rub baby oil on her vagina, and then rub his penis against it. If C.N.R. would protest, Rucker would slap her. He threatened harm to her favorite pet if she said anything. C.N.R. admitted that although she was asked several times and by several different people, she always denied that any abuse occurred, having been told that if she said anything she would be taken away from him. She was scared. The last incident of abuse occurred during the last scheduled visitation before Rucker was arrested. She said she finally admitted to being abused because she "wanted where he wouldn't do it anymore."

Others suspected that C.N.R. was being abused. Kathy found a pubic hair in C.N.R.'s underwear after she had returned from a visit. The incident was reported to the police but no action was taken because C.N.R. denied that any abuse was taking place.

Health care practitioners testified that Rucker brought C.N.R. to a clinic for a pregnancy test in 1996, and when they spoke to C.N.R. alone, Rucker became angry. A detective testified a search warrant executed on Rucker's residence after his arrest produced a bottle of baby oil and a baby oil stain on the bedspread where

C.N.R. slept when she visited Rucker. A counselor testified C.N.R. told her Rucker abused her on almost every visit and the nature of the abuse was identical to that testified to by other parties.

The events which resulted in the stalking charge occurred after C.N.R. made the sexual abuse allegations and while the claim was being investigated between April 2, 1997, and April 15, 1997. Although there was a court order suspending Rucker's right of visitation and contact with C.N.R., he followed her school bus and watched her repeatedly from a restaurant and a gas station while she was at school. C.N.R. testified she knew Rucker was watching and following her and it frightened her. A school district employee was assigned to sit on the bus with her and protect her.

C.N.R. testified she saw Rucker watching her from the gas station on her first day back after being released from the children's home. She reported the sighting to her teacher. She saw him watching from the restaurant across the street, stating, "I was scared; and wherever I went, it's like he was watching me. . . . He made me feel like I couldn't ever go anywhere without being watched."

C.N.R.'s bus driver told of an incident where Rucker drove in front of the school bus, forcing it to stop, and then glared at her "evil like, just looked at me real evil." The bus driver testified that C.N.R. was on the bus and knew her father was following her.

The principal at C.N.R.'s school testified that someone from the restaurant had called to report that a person was watching the children on the playground from the restaurant location. The description fit Rucker, who was identified by the principal.

C.N.R.'s teacher testified she saw Rucker watching from the gas station and that on one occasion Rucker brought C.N.R.'s backpack to school while C.N.R. was not there. The backpack contained a picture of C.N.R.'s cat that was located at Rucker's home. C.N.R. perceived the picture as a threat from Rucker that he might harm her pet.

A waitress at the restaurant testified that when she waited on Rucker, he was looking out the window. He described C.N.R. and told the waitress that the girl knew he was watching her.

Rucker's attorney, who had represented him for the past 10 to 15 years, testified he told Rucker there was no problem with watching C.N.R. from the restaurant. On cross-examination, the attorney admitted that a no contact order under circumstances such as these usually meant no contact of any kind. He testified that Rucker brought C.N.R. to his office and when asked whether she wanted to live with Rucker full-time rather than part-time, she answered "yes."

Rucker was found guilty of both counts and sentenced to a term of 213 months.

*Psychological Evaluation*

Rucker first argues the trial court abused its discretion in denying his request for a psychological evaluation of the alleged victim.

The standard of review of a defendant's motion for a psychiatric examination of a complaining witness in a sex crime case is whether the trial court abused its discretion in denying such request. *State v. Brown*, 249 Kan. 698, 710, 823 P.2d 190 (1991).

Judicial discretion is abused only when the action is arbitrary, fanciful, or unreasonable. Said in another way, discretion is abused only when no reasonable person would take the actions and view adopted by the trial court. *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 (1991).

In his motion requesting a psychological evaluation of C.N.R., Rucker suggested C.N.R. had been under psychological care relating to the alleged acts, the nature of her testimony was crucial to his defense, the complaining witness had psychological motivations for making the charge, and the evidence would be relevant to the issue of the credibility of the complaining witness.

In arguing on the motion prior to trial, Rucker pointed to the long-term visitation and custody battle and implied the prior disputes between C.N.R.'s mother and himself had a psychological effect on C.N.R. The State presented evidence which corroborated C.N.R's story. It proffered reports of her suspected abuse; evidence corroborating her claims, including the baby oil stains on the bedspread; Rucker's bizarre behavior in having C.N.R. submit

to a pregnancy test; and Rucker's past sexual abuse of another daughter. There was no evidence of C.N.R. ever making false accusations and no evidence that C.N.R. was mentally unstable or lacked veracity.

In ruling on Rucker's motion, the trial court recognized his concerns but found there was significant testimony corroborating C.N.R.'s allegations, and that nothing about C.N.R. indicated a disease or defect that would be spotted in a psychological evaluation. The trial court concluded C.M.R.'s credibility would ultimately have to be judged by a jury and overruled the motion.

*State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979), is the controlling Kansas authority on this issue. After discussing different ways other jurisdictions have dealt with the issue, we adopted a middle ground approach, holding "a trial judge has the discretion to order a psychiatric examination of the complaining witness in a sex crime case if the defendant presents a compelling reason for such examination." 226 Kan. at 489.

We followed *Ballard v. Superior Court*, 64 Cal. 2d 159, 49 Cal. Rptr. 302, 410 P.2d 838 (1966), suggesting that

" 'the trial judge should be authorized to order the prosecutrix to submit to a psychiatric examination if the circumstances indicate a necessity for an examination. Such necessity would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity.' " *Gregg*, 226 Kan. at 489.

In our case, like in *Gregg*, no facts were stated or evidence introduced as to the child's mental instability, lack of veracity, similar charges against other men proven to be false, or any other reason why this particular child should be required to submit to such an examination.

Rucker recognizes the authority of *Gregg* but asserts the trial court failed to give sufficient consideration to the hostile relationship between Rucker and C.N.R.'s mother. Additionally, Rucker contends the trial court erroneously commented about evidence concerning his stalking charge.

The trial court's ruling was not an abuse of discretion. Rucker had the burden of presenting evidence to establish a compelling

reason for the psychological examination and failed to do so. This case is similar to others in which the burden of showing mental instability, lack of veracity, similar charges against other men proven to be false, or some other reason why a particular victim should be required to submit to examination went unsatisfied. See *State v. Brown*, 249 Kan. at 710-11 (the trial court did not abuse its discretion in denying defendant's request because he failed to present evidence that would warrant a psychiatric examination of the complaining witness); *State v. Blackmore*, 15 Kan. App. 2d 539, 542, 811 P.2d 54, *aff'd in part and reversed in part* 249 Kan. 668, 822 P.2d 49 (1991) (no abuse of discretion to deny motion for psychiatric examination; no evidence that complaining witness was mentally unstable or lacked veracity).

*Prior sexual misconduct*

Rucker contends the trial court erred when it permitted the State to introduce evidence under K.S.A. 60-455 that he had abused an older daughter in a similar manner.

The admissibility of prior crimes evidence under K.S.A. 60-455 is within the discretion of the trial court and will not be interfered with unless such discretion is abused or unless the evidence is clearly irrelevant to any of the issues. *State v. Nunn*, 244 Kan. 207, 210-11, 768 P.2d 268 (1989); *State v. Riedel*, 242 Kan. 834, 839, 752 P.2d 115 (1988). As we have previously stated, discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Martin*, 237 Kan. 285, Syl. ¶ 2, 699 P.2d 486 (1985). A party claiming abuse of trial court discretion bears the burden of showing such abuse. *State v. Larry*, 252 Kan. 92, 95, 843 P.2d 198 (1992).

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

There are three requirements which must be satisfied for evidence to be admitted under K.S.A. 60-455. The trial court must find that "(1) the evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) probative value of the evidence outweighs its potential prejudice." *State v. Lane*, 262 Kan. 373, 388, 940 P.2d 422 (1997).

The required hearing prior to trial revealed the State sought to introduce the previously described testimony of K.T. and S.R. The record shows that the nature of the abuse of S.R. and C.N.R. was similar, a yellow lotion was being used, penetration was not accomplished, threats to pets were made, and similar statements were made.

Defense counsel argued the prejudicial impact outweighed its probative value and contended that if admitted, it would deny Rucker a fair trial.

The trial court ruled:

"I am going to allow the evidence as it is relevant to prove intent, identity, preparation, plan, and lack of mistake or accident. I recognize that it is prejudicial; but I find that its probative value outweighs its prejudicial effect, and you [defense counsel] will certainly be allowed to test the credibility of these witnesses through your cross-examination."

On appeal, Rucker contends the trial court erred in admitting evidence of prior abuse of S.R. He contends the factors listed were not materially disputed facts and that the prejudicial effect outweighs the probative value of the testimony to the extent that his right to a fair trial was denied.

Few areas of our jurisprudence have been subject to more conflicting views and decisions than the application of K.S.A 60-455. See 1 Gard and Casad, Kansas C. Civ. Proc. 3d Annot. § 60-455 (1997). We will not by this case solve any of the problems spawned by a myriad of prior cases.

Rucker argues first that, in applying the three-part test, the evidence was not relevant to any of the statutory factors. While we will hereinafter state that certain of such factors may have been improperly included in the trial court's ruling, the striking similarity between the manner of abuse testified to by S.R. and C.N.R. makes the testimony relevant. We said in *State v. Faulkner*, 220 Kan. 153,

Syl. ¶ 6, 551 P.2d 1247 (1976), that evidence is relevant if it renders the desired inference more probable than it would be without the evidence or has any tendency in reason to prove a material fact. We hold the necessary relevance was clearly established for the trial court to consider the admissibility of prior acts evidence.

In considering the intent exception, Rucker contends his intent was not a proper reason for the admission of the alleged prior crimes because intent was not at issue in the case. His defense was that the act did not occur at all and cites *Nunn*, 244 Kan. 207, Syl. ¶ 3, as holding that where criminal intent is obviously proved by the mere doing of an act, the introduction of other crimes evidence has no real probative value to prove intent.

The State counters by arguing that because the prior sexual acts with S.R. were similar to those with C.N.R., the question of intent was a disputed material fact. The State cites the holding in *State v. Nading*, 214 Kan. 249, 254, 519 P.2d 714 (1974), that "[w]here an act in itself may be susceptible of two interpretations, one innocent and the other criminal, then the intent with which the act is done becomes the critical element in determining its character." Thus, the State argues that in presenting its case in order to sustain its burden of proof, intent *was* in issue. The State also contended that Rucker had not claimed at the pretrial hearing that the acts had not occurred, but only that the evidence was not relevant and unduly prejudicial. Because of this, the State contends that intent remained an issue in dispute.

This court has addressed a similar issue in *State v. Damewood*, 245 Kan. 676, 783 P.2d 1249 (1989), and later in *State v. Clements*, 252 Kan. 86, 89-90, 843 P.2d 679 (1992). The defendant in *Damewood*, much like in this case, argued that his defense was innocence and that intent was not an issue because the mere doing of the act shows intent. Damewood had committed a similar crime in the past with a different victim. We concluded that the testimony of the prior crime met all of the requirements for admission under K.S.A. 60-455 and that its probative value outweighed any prejudice. In reaching this conclusion in *Damewood*, we relied upon *State v. Fisher*, 222 Kan. 76, 85, 563 P.2d 1012 (1977) (evidence of prior similar sexual acts was admissible to prove intent, plan,

and design), and *State v. Crossman*, 229 Kan. 384, 624 P.2d 461 (1981).

Our *Crossman* decision allowed evidence of prior sexual acts with the same child to be admitted independent of K.S.A. 60-455 under our rule that, in cases involving illicit sexual activity with a child, evidence of prior similar acts between the same parties is admissible independent of K.S.A. 60-455. The *Damewood* court further commented: " 'This is not to say that evidence of prior acts could not have been introduced pursuant to K.S.A. 60-455 to establish intent.' " *Damewood*, 245 Kan. at 681 (quoting *Crossman*, 229 Kan. at 387).

*Damewood* expanded the *Crossman* decision and essentially held that testimony the defendant committed similar sexual acts with someone other than the complaining witness was properly admitted to show intent and plan. A similar situation clearly exists under the fact of this case.

The testimony in the present case showed that Rucker's abusive nature was substantially similar as to both S.R. and C.N.R. Both victims were abused from the time they were 5 years old until just before puberty. Both victims were the legal children of the perpetrator. Both victims testified Rucker applied a lubricant to her vaginal area. Both victims testified Rucker rubbed his penis on the lubricated area until he reached satisfaction. Both victims testified that Rucker slapped them if they protested in any way. There was evidence that Rucker threatened to kill the pets of both victims should they disclose the abuse.

We reached the same result in *Clements* as we did in *Damewood*. In *Clements*, it was argued that, as to the admission to show intent, *Nunn*, 244 Kan. 207, stands for the proposition that " 'intent becomes an issue for the purposes of K.S.A. 60-455 only when the defendant admits doing the act in question but maintains that he did it in innocence.' " 252 Kan. at 90.

Based on the facts in *Clements* that the defendant's actions might be construed to be innocent in nature we held:

"In Clements' situation, intent must be proved to support a charge of sexual battery (a backrub does not, by itself, necessarily constitute sexual battery).

"*Damewood* is controlling on the issue of plan. The general method used by Clements to entice young boys is similar enough to show a common approach that is tantamount to a plan.

"Clements' argument arising from [*State v.*] *Graham*[, 244 Kan. 194, 768 P.2d 259 (1989),] and *Nunn* is not persuasive." 252 Kan. at 90.

The admission of the prior sexual misconduct in *Clements* was proper because the defendant's intent could have been innocent and was therefore a factual issue. Also, in *Clements,* as in *Damewood* and in our case, the plan exception justified admission of the testimony. See *State v. Tiffany,* 267 Kan. 495, 986 P.2d 1064 (1999), for a similar discussion on this issue and additional comments on earlier cases which we will not repeat herein.

The logic and reasoning behind the admission of similar sexual misconduct based on the proof of intent may be questioned in prior cases as well as this one, but the evidence admitted in each case clearly shows plan. And, we have held that even if erroneous for one reason, where there are other reasons for admission which follow the exceptions, the error is harmless. See *State v. McBarron,* 224 Kan. 710, 713, 585 P.2d 1041 (1978).

We are hard-pressed to see how identity was in any manner an issue in this case, notwithstanding the State's contention that Rucker's taking C.N.R. to a clinic for a pregnancy test justified a belief that identity could be a material fact because according to Rucker she had "messed a couple weeks earlier with some boys at the baby sitter." We believe that Rucker's argument on appeal that identity was not in issue better states the situation. It is interesting to note that identity as set forth in K.S.A. 60-455 was in earlier cases in Kansas considered to relate to "identity of person or crime." See *State v. Frizzell,* 132 Kan. 261, 264, 295 Pac. 658 (1931). However, *Lane,* 262 Kan. at 389, held that identity was a material fact in a Kansas death because the defendant testified he was not involved in a death occurring in a substantially similar matter in another State. We hold that identity is not a 60-455 factor to be considered in this case.

In considering the exception relating to plan and preparation, Rucker argues that no causal link existed between the prior sexual abuse and the current allegations and that the long time period

separating their occurrences rendered them unrelated. The State relies on *Damewood*, 245 Kan. at 682, in its contention that when a complete denial exists, evidence of prior sexual acts that are similar is admissible to show the plan or method of operation and conduct utilized by the defendant to accomplish the same crime or acts.

In *Damewood*, we said:

"Admission of evidence under 60-455 to show plan has been upheld under at least two theories. In one the evidence, though unrelated to the crimes charged, is admitted to show the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes.

. . . .

"The rationale for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455 is that the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts. In such cases the evidence is admissible to show the plan or method of operation and conduct utilized by the defendant to accomplish the crimes or acts. [Citation omitted.]

"Another line of cases has held evidence of prior crimes or acts is admissible to show plan where there is some direct or causal connection between the prior conduct and the crimes charged." 245 Kan. at 681-82.

The prior crimes evidence in *Damewood* was admitted because it "was strikingly similar to the method and plan" used in the later crime. 245 Kan. at 682.

As we have noted in the intent analysis, there are striking similarities between the alleged and prior offenses to warrant the admissibility of the testimony to prove plan. See *Clements*, 252 Kan. at 90; *State v. Grissom*, 251 Kan. 851, 924, 840 P.2d 1142 (1992) (applying *Damewood* to uphold trial court's determination that unrelated evidence of a similar prior crime admissible to show plan in current charge).

Rucker relies on *State v. Marquez*, 222 Kan. 441, 446, 565 P.2d 245 (1977), where preparation for an offense is defined as "devising or arranging means or measures necessary for its commission" to argue that preparation is not applicable here because no series of acts in preparation for the crime were shown. Essentially, he argues that the alleged abuse of S.R. cannot be said to be preparation for the later abuse of C.N.R. Although the modus operandi of the two

crimes were similar, it is difficult not to agree with Rucker that this is not a situation where one initiates and sets forth a process aimed at eventual completion of the later crime. See Slough, *Other Vices, Other Crimes: An Evidentiary Dilemma*, 20 Kan. L. Rev. 411, 422 (1972).

Finally, as to lack of mistake or accident, that element was not at issue because there was no contention that the acts were purely those normal to the interplay between a father and a young daughter. This is really nothing more than another way of saying that the defendant acted intentionally. See *Faulkner*, 220 Kan. at 156-57.

As to those disputed elements for which the prior crimes evidence was relevant in this case, we hold the probative value of the evidence outweighed its potential to prejudice, and we find no abuse of discretion in the admission of the testimony. Although the trial court abused its discretion by *also* admitting the evidence to prove certain other elements which were *not* in dispute, we note the large volume of other evidence and the overall strength of the case against Rucker in concluding that such error was harmless and does not require a new trial in this case.

*Constitutionality of stalking statute, K.S.A. 21-3438*

Rucker was charged with one count of stalking in violation of K.S.A. 21-3438. He moved to dismiss, contending the stalking statute was unconstitutionally vague because it is unclear from the statute what constitutes "alarming, annoying, or harassing" conduct. Additionally, he argued that although the statute defines "course of conduct" in subsection (d), it does not list "course of conduct" as an element of stalking in subsection (a).

The State countered that subsequent to *State v. Bryan*, 259 Kan. 143, 910 P.2d 212 (1996), where we held the 1994 version of the statute unconstitutionally vague, the legislature amended it to correct the vagueness problem. Additionally, the State noted the present version of K.S.A. 21-3438 defines harassment and that the PIK instruction specifically defines "course of conduct" within the context of harassment. The trial judge overruled Rucker's motion, stating: "[T]he statute has been changed, I think that it's clear what it means . . . especially in light of the PIK instruction and the way it's defined."

Although the Kansas Legislature passed the law against stalking in 1992 (L. 1992, ch. 298, § 95), it was amended in 1994 (L. 1994, ch. 348, § 13). This was the version we found unconstitutional in *Bryan*. It was amended in 1995 (L. 1995, ch. 251, § 10), and that is the version of K.S.A. 21-3438 to which this appeal relates:

"(a) Stalking is an intentional, malicious and repeated following or harassment of another person and making a credible threat with the intent to place such person in reasonable fear for such person's safety.

. . . .

"(d) For the purpose of this section: (1) 'Course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose and which would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial emotional distress to the person. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

(2) 'Harassment' means a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose.

(3) 'Credible threat' means a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for such person's safety. The present incarceration of a person making the threat shall not be a bar to prosecution under this section."

Whether a statute is unconstitutionally vague is a question of law over which our review is de novo and unlimited. *Bryan*, 259 Kan. at 145. In *Bryan*, we quoted from *State v. Adams*, 254 Kan. 436, 438-39, 866 P.2d 1017 (1994), as to the criterion applicable when addressing whether a statute is unconstitutionally vague:

" ' " 'The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt.' " [Citation omitted.]

" 'In relation to the specific complaint of vagueness, this court stated:

"'[T]he void-for-vagueness analysis is based upon a due process requirement that a criminal statute is unconstitutionally vague and indefinite unless its language

conveys a sufficiently definite warning of the conduct proscribed when measured by common understanding and practice. [Citation omitted]." [Citation omitted.]

In *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 (1983), the test was stated as

"whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. A statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process." . . .

" 'In addition to the inquiry whether the proscribed conduct is adequately defined, the court recognizes that a second inquiry is appropriate. That inquiry is " 'whether the ordinance adequately guards against arbitrary and discriminatory enforcement.' [Citations omitted.]" When making either inquiry, the court should bear in mind that "[t]he standards of certainty in a statute punishing criminal offenses are higher than in those depending primarily upon civil sanctions for enforcement." [Citation omitted.]

" 'In *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972), the United States Supreme Court discussed the reasons why

"[v]ague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on a *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' " *Bryan*, 259 Kan. at 145-46.

When we held the 1994 version of the stalking law unconstitutional in *Bryan*, we held it was impermissibly vague because it used the terms "alarms," "annoys," and "harasses" without defining them or without including an objective standard in which to measure the prohibited conduct. 259 Kan. at 151.

We referred to Boychuck, *Are Stalking Laws Unconstitutionally Vague or Overbroad?*, 88 Nw. U.L. Rev. 767 (1994), in our *Bryan* opinion in stating:

"[T]hose stalking laws most capable of withstanding challenges of vagueness and overbreadth, based on the above terms, have three main components: (1) They require a credible threat along with the harassing conduct; (2) exempt constitutionally protected activity; and (3) *define the terms in relation to an objective standard*." *Bryan*, 259 Kan. at 149.

We spoke favorably in *Bryan* of the 1992 version of the Kansas stalking law, noting that version incorporated an objective standard upon which conduct could be measured:

"The 1992 version of the Kansas stalking law incorporated an objective standard. As originally enacted, the statute prohibited the 'willful, malicious and repeated following *and harassment* of another person.' L. 1992, ch. 298, § 95. (Emphasis added). The term 'harassment' was defined as a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and *which would cause a reasonable person to suffer substantial emotional distress* and actually causes that type of distress in the victim. See L. 1992, ch. 298, § 95. Although the terms 'alarms,' 'annoys,' and 'harasses' were used [in the 1992 version], they were defined by an objective standard in that the conduct must be such as would cause a reasonable person to suffer emotional distress and actually cause such distress." 259 Kan. at 150.

The 1995 version of K.S.A. 21-3438 incorporates an objective standard as recommended by *Bryan*. Additionally, the 1995 law defines the terms "course of conduct," "harassment," and "credible threat." Thus, it appears to resolve the vagueness problems found by this court in *Bryan*.

Rucker recognizes the changes to the 1995 version of K.S.A. 21-3438 but contends the new law still suffers from vagueness and therefore is unconstitutional. He specifically complains that the terms "repeated" in subsection (a), "legitimate purpose" in subsection (d)(2), and "apparent ability" in subsection (d)(3) are unconstitutionally vague.

Repeated Pattern

The Kansas Stalking Law uses the terms "repeated," "course of conduct," and "series of acts." According to Rucker, this combination of terms vaguely requires a "repeated pattern of conduct." Rucker notes that in *Commonwealth v. Kwiatkowski*, 418 Mass. 543, 637 N.E.2d 854 (1994), the Massachusetts Supreme Court addressed this same argument and determined the stalking law in that state was unconstitutionally vague.

In *Kwiatkowski*, the court noted that the stalking law in Massachusetts, Mass. Gen. L. ch. 265, § 43(a) (1992) provides: " 'Whoever willfully, maliciously, and repeatedly follows or harasses another person and who makes a threat with the intent to place that

person in imminent fear of death or serious bodily injury shall be guilty of the crime of stalking.' " *Kwiatkowski,* 418 Mass. at 546.

The *Kwiatkowski* court noted that the statute further defined "harasses" at section 43(d) as "a knowing and willful *pattern of conduct or a series of acts* over a period of time directed at a specific person." (Emphasis added.) 418 Mass. at 546, n.3. The *Kwiatkowski* court stated:

"To be guilty under the 'harassment' aspect, as opposed to the 'following' aspect, of § 43(a), it can be fairly argued, based on § 43(d), that one must repeatedly harass, that is, must engage repeatedly (certainly at least twice) in a pattern of conduct or series of acts over a period of time. Under this interpretation, there must be repetition of either a pattern of conduct or a series of acts. One pattern or one series would not be enough.

. . . .

". . . A single pattern of conduct or a single series of acts, combined with other elements of the crime, was presumably intended to constitute the crime. That is not, however, stated in § 43 with sufficient clarity to avoid the force of the defendant's claim of unconstitutional vagueness." 418 Mass. at 546-47.

While *Kwiatkowski* appears to support Rucker's claim that the Kansas stalking statute suffers from vagueness in the same way as the Massachusetts statute, other jurisdictions have rejected vagueness claims addressed to similar statutory language.

In *People v. Heilman,* 25 Cal. App. 4th 391, 30 Cal. Rptr. 2d 422 (1994), *rev. denied* Aug. 25, 1994, the California Court of Appeals addressed the same issue before us. The California stalking statute applicable in *Heilman,* section 646.9, provided:

" '(a) Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear of death or great bodily injury is guilty of the crime of stalking.' " 25 Cal. App. 4th at 398.

The term "harasses" was defined in part as "willful course of conduct." "Course of conduct" was defined in part as " 'a series of acts over a period of time.' " 25 Cal. App. 4th at 399. Heilman based his claim on the vagueness of the term "repeatedly," just as Rucker does in this case. The *Heilman* court stated:

" 'Repeatedly' is a word of such common understanding that its meaning is not vague. It simply means the perpetrator must follow the victim more than one time. There is nothing mysterious or ambiguous about the term 'repeatedly' to

lead an actor to reasonably believe he will not be subject to the penalty under the statute if he engages in willful, malicious following on more than one occasion." 25 Cal. App. 4th at 400.

The *Heilman* court held that the term "repeatedly" was "not so vague as to create the danger of arbitrary and discriminatory enforcement of the law." 25 Cal. App. 4th at 400.

Additionally, other jurisdictions with statutory language similar to the Kansas stalking statute have determined their stalking laws are constitutionally sound. See *e.g., Snowden v. State,* 677 A.2d 33 (Del. 1996), (finding [1] "repeatedly" modifies "follows" and not "harasses," [2] "repeated following" is an element of stalking and harassing is an alternative element, [3] because only one logical reading was possible, the statute is not ambiguous on its face, and [4] a person of ordinary intelligence would understand that following a person on several days would constitute harassment); *United States v. Smith,* 685 A.2d 380, 385 (D.C. App. 1996) (holding the terms "on more than one occasion," "repeatedly," and "course of conduct" were not meant to modify each other, should be given their ordinary meaning and, thus, were not unconstitutionally vague; they do not fail "to define the quantum of behavior necessary to commit the crime"); *Pallas v. State,* 636 So. 2d 1358 (Fla. App. 1994), *aff'd* 654 So. 2d 127 (Fla. 1995) (holding [1] the terms "willfully, maliciously, and repeatedly" modify only the word "harasses," and [2] this language, read in conjunction with the definitions, was reasonably clear and specific; thus, the terms did not make the statute unconstitutionally vague); *State v. Fonseca,* 670 A.2d 1237, 1240 (R. I. 1996) (finding that the phrase "repeatedly follows and harasses" did not render statute unconstitutionally vague because a person of ordinary intelligence could understand what behavior was prohibited).

We agree with the overwhelming majority of other jurisdictions that repeated or repeatedly is a word of common understanding so that its meaning is not vague. It simply means that the following or harassment must have occurred more than one time. This is a meaning that is sufficiently definite to overcome a challenge for vagueness.

## Apparent Ability

The term "credible threat" is defined in part as "the apparent ability to carry out the threat" in subsection (d)(3) of the Kansas stalking statute. Rucker argues this term is not defined in the statute and therefore contends it is unconstitutionally vague. He points to a recent law review article in which the author observes:

"It is unclear what a person needs to possess in order to have an apparent ability to carry out a threat. One would think that every stalker, even every living person, would have an apparent ability to carry out a communicated threat, especially when the statute states that '[t]he present incarceration of a person making the threat shall not be a bar to prosecution' under the credible threat section." Note, *The Kansas Stalking Law: A "Credible Threat" to Victims. A Critique of the Kansas Stalking Law and Proposed Legislation*, 36 Washburn L.J. 468, 487 (1997).

Rucker cites no other authority. He contends, however, that the inclusion of this language in the statute requires "something more than intent . . . to prove a credible threat, but it leaves completely unanswered what that extra something is."

The State counters that Rucker reads the term "apparent ability" in isolation, without considering the phrase following that term. The State notes that what follows the term "apparent ability" is the phrase "to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for such person's safety." The State cites *In re M.S.*, 10 Cal. 4th 698, 42 Cal. Rptr. 2d 355, 896 P.2d 1365 (1995), in which the California Supreme Court interpreted similar language in that state's hate crime statute. The *M.S.* court stated:

"Both 'apparent ability to carry out a threat' and 'having a reasonable tendency to induce fear in a victim' are essentially two aspects of the same idea. A person who, in making a threat of violence, displays the apparent ability to carry out the threat ordinarily will also reasonably tend to induce fear of such violence in the victim." 10 Cal. 4th at 715-16.

No other jurisdiction appears to have addressed this issue. However, it is noteworthy that the states having statutes which include the undefined term "apparent authority" have upheld the constitutionality of their statutes when the claim was vagueness. See *e.g.*, *State v. Randall*, 669 So. 2d 223 (Ala. Crim. App. 1995); *People v. Tran*, 47 Cal. App. 4th 253, 54 Cal. Rptr. 2d 650 (1996).

Under K.S.A. 21-3438(d)(3), the apparent ability to carry out any credible threat will be revealed by the words, acts, actions or circumstances which "cause the person who is the target of the threat to reasonably fear for such person's safety." This will depend on the objective facts of a given case. Here, Rucker was pursuing a 10-year-old girl he had allegedly sexually abused in the past. His conduct carried an implied threat that he had the apparent ability to carry out. When viewed realistically and not hypothetically, the term apparent ability is based on an objective standard and is not unconstitutionally vague.

Legitimate Purpose

Rucker contends the phrase "legitimate purpose" is unconstitutionally vague. He notes the term is not defined in the current stalking statute. He cites *State v. Norris-Romine*, 134 Or. App. 204, 210, 894 P.2d 1221 (1995), in which the Oregon Court of Appeals determined that the phrase "legitimate purpose" in that state's stalking statute was unconstitutionally vague.

The State argues that Rucker's reliance on *Norris-Romine* is erroneous. The State cites *State v. Lee*, 82 Wash. App. 298 , 917 P.2d 159 (1996), *aff'd* 135 Wash. 2d 369, 957 P.2d 741 (1998), for support for its contention. In *Lee*, the Washington Court of Appeals rejected the defendant's assertion that the term "lawful authority" was unconstitutionally vague. In reaching its conclusion, the *Lee* court noted "there are many identifiable sources of law which could give individuals 'lawful authority' to follow others. Persons of common intelligence may look to these sources to determine whether their behavior violates the stalking statute." 82 Wash. App. at 311.

The only other case that has addressed this issue is *Tran*, 47 Cal. App. 4th 253. In *Tran*, the California Court of Appeals held that the term "legitimate purpose" was not constitutionally vague when viewed in context of the statute as a whole. The *Tran* court essentially disagreed with the defendant's contention that the phrase "has no definite meaning and thus allows the jurors to impose their own moral judgment on his actions, which he may have believed had a legitimate purpose." 47 Cal. App. 4th at 260. The *Tran* court noted "[the defendant] lifts the phrase entirely out of context and

attempts to focus on his view of his activities rather than the view of the victim or a reasonable person." 47 Cal. App. 4th at 260.

Although they did not specifically address the term legitimate purpose, several jurisdictions have upheld constitutional challenges based on vagueness where the statute contained similar language. See, *e.g.*, *Randall*, 669 So. 2d 223; *Heilman*, 25 Cal. App. 4th 391; *Snowden*, 677 A.2d 33; *Pallas*, 636 So. 2d 1358; *Fonseca*, 670 A.2d 1237.

Subsequent to oral argument, Rucker has, pursuant to Rule 6.09(b) (1998 Kan. Ct. R. Annot. 40), suggested his claim of void for vagueness is enhanced by the United States Supreme Court decision of *City of Chicago v. Morales*, 527 U.S. 41, 144 L. Ed. 2d 67, 119 S. Ct. 1849 (1999), where a Chicago loitering ordinance was struck down for vagueness.

Our examination of *Morales* does not change the result we reach. The usage of the phrase "no apparent purpose" in the Chicago ordinance is not comparable to the manner in which the term "no legitimate purpose" is used in our stalking statute. When we focus on the view of reasonable persons as to when lawful authority exists to follow others, the presence or absence of a legitimate purpose for an act or action can readily be determined.

It appears to us that all the amendments made in the 1995 stalking law followed our recommendation in *Bryan*. The majority of jurisdictions with statutes which include these terms have upheld the constitutionality of their statutes and reject vagueness claims. The terms "repeatedly," "apparent authority," and "legitimate purpose" when read in conjunction with the rest of the statutory language do not require that a person of common intelligence guess as to their meanings. The terms are defined in relation to an objective standard, the statute contains a credible threat element, and it excludes constitutionally protected conduct. We reject Rucker's claim of vagueness and hold K.S.A. 21-3438 to be constitutional.

*Sufficiency of evidence*

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution,

the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Knighten*, 260 Kan. 47, Syl. ¶ 1, 917 P.2d 1324 (1996).

Instruction No. 7 set forth the elements of stalking:

"In Count Two (2) the defendant, Frank F. Rucker, Jr., is charged with the crime of stalking. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant, Frank F. Rucker, Jr., intentionally, maliciously and repeatedly followed or harassed [C.N.R.];

"2. That the defendant made a credible threat against [C.N.R.] with the intent to place [C.N.R.] in reasonable fear for her safety; and

"3. That these acts occurred on or between the 1st day of April, 1997, and the 15th day of April, 1997, in Sedgwick County, Kansas."

The instruction defined the terms "Harassment," "Course of Conduct," and "Credible Threat."

Rucker contends there was insufficient evidence that he made a "credible threat," and insufficient evidence to prove C.N.R. was in "reasonable fear for her safety." He claims he lacked the intent to threaten, noting that the State presented no evidence to show that he had ever gestured, approached, contacted, or called out to C.N.R. even though he admits that he watched her from a distance. The State's reliance upon the picture of the cat to prove he threatened C.N.R. and that she was fearful was, according to Rucker, given too much weight. He notes that the picture of the cat was in her backpack along with several other items which had been removed by her teacher. Thus, "the picture probably seemed to have much more sinister connotation when found in an empty backpack."

The State argues the threat to C.N.R. was evidenced and implied by a "pattern of conduct." The evidence presented at trial showed that (1) C.N.R. was sexually abused by Rucker, (2) if she cried during the abuse, Rucker would slap her, (3) when Rucker took C.N.R. to the ER for a pregnancy test, witnesses testified he told her not to speak except to give her name, (4) Rucker followed C.N.R.'s school bus on more than one occasion, (5) he repeatedly watched her from the restaurant and gas station located next to the

school, (6) C.N.R. was aware of his presence, and (7) C.N.R. was frightened by it.

In addition, it should also be noted that Rucker was under a specific court order suspending his rights of visitation and all contacts with C.N.R. during the period of his testified actions.

Under our standard of review, when we review all the evidence, viewed in the light most favorable to the prosecution, a rational jury could have found Rucker guilty of stalking beyond a reasonable doubt. There was sufficient evidence to uphold the conviction of stalking.

Affirmed.