Nos. 88,692
88,835
89,595
88,899

STATE OF KANSAS, *Appellant,* v.
MICHAEL J. ARMSTRONG, *Appellee.*
(80 P.3d 378)

Opinion filed
December 12, 2003.

*Steven J. Obermeier,* assistant district attorney, argued the cause, and *Paul J. Morrison,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellant.

*Randall L. Hodgkinson,* deputy appellate defender, argued the cause and was on the brief for appellee.

*Todd D. Powell,* of Fisher, Cavanaugh, Smith & Lemon, P.A., of Topeka, for *amicus curiae* Kansas Chamber of Commerce and Industry.

The opinion of the court was delivered by

BEIER, J.: This consolidated appeal follows dismissals of four criminal cases on the ground that K.S.A. 2002 Supp. 21-3764(d), which defines unlawful removal of a theft detection device, is unconstitutionally vague.

Michael Armstrong, Winerford Hill, Sr., Clifford Griggs, and Kimona Sawyer were each charged with violating the statute. Unlawful removal of a theft detection device is a severity level 9 nonperson felony. K.S.A. 2002 Supp. 21-3764(f).

Defendant Armstrong's charge arose out his conduct at a Home Depot hardware store. Theft detection sensors attached to the store's merchandise must be deactivated at a cash register before the merchandise is removed from the store. Armstrong walked out of the store, tripped an alarm, and ran back inside. Department Manager David Dinges was called to confront him; and Dinges observed Armstrong in an aisle with two nailers and a torch, which was out of its box. Dinges asked Armstrong if he needed help, and Armstrong said "no." Dinges continued to watch Armstrong and eventually asked him to leave the store.

A few weeks later, Dinges saw Armstrong at the store again. This time, Armstrong was climbing a rack. He was holding a nailer like one from the previous incident. Dinges watched as Armstrong took the nailer out of its case, cut the zip tie that held the case shut, and threw an electronic sensor from inside the box onto the floor. Dinges then again approached Armstrong. Armstrong first denied

that he had been the man involved in the previous incident. He later admitted trying to take the nailer.

Defendant Hill was charged after an incident at a Gordman's store. Security guard Robert Woodard observed Hill and two companions remove electronic security tags from articles of clothing. Woodard watched while Hill pulled wire cutters from his pocket and snapped off the tags. Hill then put the tags into shoes that were on display and handed the wire cutters to one of the companions before the three dispersed.

Woodard called the police department. Hill exited the store before the police arrived, but Hill's two companions were approached inside the store. Woodard and the officers recovered the clothing and the tags.

Griggs was charged because he was observed removing electronic sensor tags from digital video discs (DVDs) in a Kmart store.

Store employees confronted Griggs after he left the store, and they then called the police. It eventually was determined that Griggs had walked out with the DVDs and a stereo.

Sawyer's charge arose after she was videotaped chewing a sensor tag from a pair of sunglasses and switching price tags on several pieces of merchandise in a Gordman's store. Loss prevention officers watched the videotape while Sawyer paid for the items with the incorrect tags and left the store.

The officers approached Sawyer outside, and Sawyer admitted to switching the tags and to removing the sensor from the sunglasses and taking them without paying for them.

"Whether a statute is unconstitutionally vague is a question of law over which our review is de novo and unlimited." *State v. Rucker*, 267 Kan. 816, 830, 987 P.2d 1080 (1999).

" ' " ' "The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt." ' " ' " *Rucker*, 267 Kan. at 830.

In construing a statute, ordinary words are given their ordinary meaning. *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001); see *Burns v. Alcala,* 420 U.S. 575, 580-81, 43 L. Ed. 2d 469, 95 S. Ct. 1180 (1975).

We use a two-part test to determine whether a statute is unconstitutionally vague. First, we consider whether the statute " ' " 'conveys a sufficiently definite warning' " ' " of the proscribed conduct " ' " 'when measured by common understanding and practice.' " ' " *Rucker,* 267 Kan. at 830-31. Next, we consider " ' " 'whether the [statute] adequately guards against arbitrary and discriminatory enforcement.' " ' " *Rucker,* 267 Kan. at 831; *State v. Kirkland,* 17 Kan. App. 2d 425, 428, 837 P.2d 846, *rev. denied* 251 Kan. 941 (1992). The second part of the test embodies the " ' "requirement that a legislature establish minimal guidelines to govern law enforcement." ' " *Boyles v. City of Topeka,* 271 Kan. 69, 86, 21 P.3d 974 (2001) (Allegrucci, J., dissenting) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357-58, 75 L. Ed. 2d 903, 103 S. Ct. 1855 [1983]).

As the United States Supreme Court explained in *Grayned v. City of Rockford,* 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972):

"First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

A party challenging a statute's constitutionality bears a high burden, but we must remember that " ' "[t]he standards of certainty in a statute punishing criminal offenses are higher than in those depending primarily upon civil sanctions for enforcement." ' " *City of Wichita v. Hackett,* 275 Kan. 848, 854, 69 P.3d 621 (2003) (quoting *Rucker,* 267 Kan. at 831).

The four defendants persuaded two district court judges that the phrases "theft detection device" and "prior to purchase" and the word "removal" did not convey a definite meaning to persons of

"common intelligence." The district court held the statute there-fore failed the first part of the vagueness test outlined above.

On appeal, defendants direct our attention to other states' sim-ilar statutes, which include specific definitions of "theft detection device." These states include Colorado, Iowa, Mississippi, West Virginia, and Wisconsin. See Colo. Rev. Stat. § 18-4-417(2)(b) (2003); Iowa Code § 714.7B(4) (2003); Miss. Code Ann. § 97-23-93.1(1)(a) (2003 Supp.); W.Va. Code § 61-3A-4a(a)(1) (2000); and Wis. Stat. § 943.50(1) (2002). Defendants contend this court should not "fill in the gaps of an ambiguous statute," arguing var-iation among several of these states' specific definitions demon-strates that the phrase is a term of art requiring further explanation by our legislature. To illustrate the variation, some states include only electronic or magnetic devices in the definition of "theft de-tection devices," while others include any tag or device "used to detect or prevent theft." Compare Colo. Rev. Stat. § 18-4-417(2)(b) with Miss. Code Ann. § 97-23-93.1(1)(a).

We note, first of all, that Kansas is not alone in leaving a specific definition of "theft detection device" out of its statutory scheme. Arkansas, Arizona, Idaho, Michigan, Rhode Island, Utah, and Wy-oming share our legislature's approach. See Ark. Code Ann. § 5-36-404(a) (2003 Supp.); Ariz. Rev. Stat. Ann. § 13-1816(D) (2001); Idaho Code § 18-2411(4) (2003 Supp.); Mich. Comp. Laws § 750.360a(1)(e) (2002); R.I. Gen. Laws §11-63-1(d) (2002); Utah Code Ann. § 76-6-608(1)(d) (2003); Wyo. Stat. Ann. § 6-3-411(d) (2003).

Given the two legislative patterns available, it appears our leg-islature made an understandable choice designed to ensure that the phrase "theft detection device" was not limited to a finite list of items in current commercial use. Statutes like ours and like those that further define the phrase only in the broadest or most repet-itive terms are clearly intended to cover not only current devices but all of the as-yet-unimagined devices to be developed in the future. This does not make what we view as entirely ordinary words in the phrase unconstitutionally vague. It does make them appro-priately flexible. Persons of common intelligence would have no trouble understanding the meaning of the ordinary words making

up the phrase "theft detection device" to mean any item used for the purpose of theft detection at the time of the act alleged to be a violation.

The ordinary words that make up the phrase "prior to purchase" are even less conducive to confusion than those in the phrase "theft detection device." We are not convinced by defendants' argument that the phrase "prior to purchase" has no meaning if a purchase never occurs. Common sense dictates that, if a purchase never occurs, *everything* that happens qualifies as "prior to" it. According to the statute, a person need not attempt or succeed in facilitating theft after removing the theft detection device to have completed a crime. The crime of removal of the device is complete when the removal occurs. In contrast, a person who leaves a theft detection device attached to an item of merchandise until after the item is paid for does not commit a crime punishable under this statute. This is the ordinary, limiting, and easily understandable meaning of the phrase "prior to purchase."

Finally, with regard to "removal," defendants argue this word is vague because "[t]he statute does not clarify whether it proscribes only physical removal or includes impairment of a 'theft detection device.' " They say, by way of example, that it is not clear whether moving a tag on a compact disc to see the titles of the tracks it contains would constitute removal or whether a merchant who receives items from a manufacturer who has already equipped the items with theft detection devices violates the statute by removing the devices to repackage the items for resale.

The ordinary meaning of "removal" is commonly understood to be movement that puts space between two things or relocates one thing from one place to another. See Webster's II New Riverside University Dictionary 995 (1988) ("removal" defined as "act of removing," "fact of having been removed"; "remove" defined as "to move from a position occupied," "to convey from one place to another," "to take away"). Mere impairment or damage that does not cause a loss of physical contact between the theft detection device and the merchandise or change the position of the device from a place on the merchandise to a place not on it is not covered by the subsection in question.

The merchant's removal of theft detection devices does, not surprisingly, qualify as "removal" under the statute; but the timing of the merchant's action takes it outside the statute's prohibition. As between the manufacturer and the merchant, the relevant purchase is the transaction between them, not the transaction between the merchant and the retail consumer. The removal by the merchant, as long as it comes after the merchant's purchase of the items from the manufacturer, does not violate K.S.A. 2002 Supp. 21-3764(d).

Having examined each of defendants' arguments regarding the first part of the vagueness test and having concluded that the statute conveys a sufficiently definite warning to potential violators of the proscribed conduct when measured by common understanding and practice, we move to evaluation of the second part of the test. Although the parties devote significantly less attention to this second part, it merits careful review. If the statute is constitutionally flawed, the flaw is evident only when studied in this light.

First, we note that the subsection under which defendants were prosecuted is the only one of the definitional subsections of the statute that does not include language regarding a specific criminal intent that must be proved for conviction. The pertinent subsections provide:

"(a) Unlawful manufacturing or selling of a theft detection shielding device is intentionally manufacturing, selling, offering for sale or distributing in any way a laminated or coated bag or device *particular to and intentionally marketed for shielding and intended to shield* merchandise from detection by electronic or magnetic theft alarm sensor.

"(b) Unlawful possession of a theft detection shielding device is intentionally possessing any laminated or coated bag or device *particular to and designed for shielding and intended to shield* merchandise from detection by an electronic or magnetic theft alarm sensor, *with the intent to commit theft*.

"(c) Unlawful possession of a theft detection device remover is intentionally possessing any tool or device *designed to allow the removal* of any theft detection device from any merchandise *with the intent to use such tool to remove* any theft detection device from any merchandise without the permission of the merchant or person owning or holding such merchandise.

"(d) Unlawful removal of a theft detection device is intentionally removing the device from merchandise prior to purchase.

"(e) Unlawful possession of a sales receipt or universal product code label is possessing 15 or more fraudulent retail sales receipts or universal product code labels, or any combination thereof, or possessing the device which manufactures fraudulent retail sales receipts or universal product code labels. A person having possession, custody or control of 15 or more such receipts or labels or such device *shall be presumed to possess such items with the intent to cheat or defraud a retailer.*" (Emphasis added.) K.S.A. 2002 Supp. 21-3764.

The use of the lone word "intentionally" before the word "remove" in subsection (d) requires only that the actor must commit a volitional act rather than an accidental one. See *State v. George,* 20 Kan. App. 2d 648, 652, 891 P.2d 1118, *rev. denied* 257 Kan. 1094 (1995) ("intentional" acts are "willful," not "accidental"). It does not require any particular criminal design, *i.e.,* any specific intent to facilitate theft.

When subsection (d) is read literally, we discern a threat of arbitrary and discriminatory enforcement. As written, the subsection criminalizes the behavior of any person who willfully removes a theft detection device from an item of merchandise for any purpose. This would include a member of a ring of professional shoplifters, who removes sensors from merchandise with the explicit intention of facilitating theft. But it would also include a parent who temporarily pulls a pair of children's socks from a package of three pair to determine visually whether the socks will fit, as long as the package contains or itself constitutes a theft detection device and the removal occurs before the socks are paid for. Once the one pair of socks is no longer in contact with the package, the parent has completed the crime.

The legislature no doubt intended subsection (d) to make the professional shoplifter subject to a felony prosecution. We highly doubt that the legislature intended to label the parent a felon. But how would a law enforcement officer or judge or jury decide? And wouldn't the officer or judge or jury, in the absence of a requirement of specific criminal intent, be more apt to engage in arbitrary or discriminatory line drawing between those whose removals are deemed innocent and those whose removals are deemed suspect?

We believe the answer to each question is yes. Thus subsection (d) of the statute would fail the second part of the vagueness test

but for our willingness to read a specific criminal intent into it. There are at least two reasons why we should so read the statute in this instance.

First, the statute itself explicitly states that it shall be "part of and supplemental to the Kansas *criminal* code." (Emphasis added.) K.S.A. 2002 Supp. 21-3764(f). We have recognized that criminal statutes imply the necessity of proving a criminal purpose. "In common law, it was the general rule that acts are criminal only when they are accompanied by a blameworthy state of mind." *State v. Thompson,* 237 Kan. 562, 566-67, 701 P.2d 694 (1985). In *State v. Hart,* 200 Kan. 153, 157, 434 P.2d 999 (1967) (quoting *State v. Shedoudy,* 45 N.M. 516, 524, 118 P.2d 280 [1941]), we said: "[W]hen an act is prohibited and made punishable by statute only, the statute is to be construed in the light of the common law and the existence of a criminal intent is to be regarded as essential, although the terms of the statute do not require it." An exception would arise only if it clearly appeared the legislature intended to make an act criminal without regard to the actor's purpose. *Hart,* 200 Kan. at 157; see *Thompson,* 237 Kan. at 567; accord *State v. JC Sports Bar, Inc.,* 253 Kan. 815, 821-23, 861 P.2d 1334 (1993) (legislature has power to create absolute liability offenses, must clearly indicate intention).

In *Hart,* we examined a statute making the possession of burglary tools illegal. Although the statute omitted any reference to a possessor's specific criminal intent, we held that, when "properly construed," it required "an intent on the part of one having burglary tools in his possession to employ those tools in burglarious activities." 200 Kan. at 156.

Our construction of the statute at issue in *Hart* rescued it from the vagueness dustbin. In essence, our decision accomplished the goal of the second part of the vagueness test: It narrowed the scope of behaviors that could become the subject of an enforcement action. It limited the opportunities for arbitrary and discriminatory investigation, prosecution, and conviction. It put the ordinary homeowner with a crowbar in his or her garage who lacked any intention of using it for "burglarious" purposes beyond the reach of the law. As we said in that case, without our construction, "the innocent

possession of ordinary tools which are suitable for and commonly used in unlawfully breaking and entering another's property, might very well subject an honest workman to the statute's penalty. Certainly the legislature intended no such outlandish result when it enacted this legislation." 200 Kan. at 157; see also *Morissette v. United States*, 342 U.S. 246, 270, 96 L. Ed. 288, 72 S. Ct. 240 (1952) (absent court construction of level of knowledge required, statute "would have made crimes of all unwitting, inadvertent and unintended conversions"). We also eliminate the potential of an outlandish result through our construction here.

The second reason we should read a specific intent to facilitate theft into K.S.A. 2002 Supp. 21-3764(d) is that its omission may very well be accidental. As noted above, all of the other definitional subsections of the statute include a reference to the specific criminal intent required to establish violation.

"Even the terms of a penal ordinance should be read *in pari materia* with the other provisions of the ordinance in order to determine the precise scope of the conduct prohibited. [T]he words in a statute or ordinance must be construed in light of their context and the purpose of the enactment." *Cardarella v. City of Overland Park*, 228 Kan. 698, 705, 620 P.2d 1122 (1980).

The context and purpose of the enactment before us are obvious. The legislature was trying to give retailers and prosecutors another way to combat theft. They were not interested in preventing innocent shoppers from examining merchandise closely enough to determine whether to buy it. K.S.A. 2002 Supp. 21-3764(d), properly construed, includes a requirement that the accused possess a specific intent to facilitate a theft. This construction provides adequate safeguards against arbitrary and discriminatory enforcement, enabling the provision to pass the second part of our vagueness test.

Finally, one additional point merits brief attention.

Defendants also objected to the statutory subsection because, in their view, it turns an overt act toward the commission of an attempted misdemeanor theft into a felony. They may be correct. However, as the State responded during oral argument, this is a criticism better directed to the legislature. We are not at liberty to strike down statutes because we view them as unwise or, as defen-

dants would have us characterize this provision, symptomatic of our society's insatiable appetite for retribution. As we said in *Cardarella*:

" 'The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state. . . . [T]he views of members of the court [are] immaterial.' " 228 Kan. at 700-01 (quoting *City of Baxter Springs v. Bryant,* 226 Kan. 383, Syl. ¶ 3, 598 P.2d 1051 [1979]).

Reversed and remanded for further proceedings consistent with this opinion.