No. 92,193

STATE OF KANSAS, *Appellee,* v. JOSEPH "ZEKE" RUPNICK, *Appellant.*

(125 P.3d 541)

722

Opinion filed December 16, 2005.

*Michael C. Hayes,* of Oskaloosa, argued the cause and was on the brief for appellant.

*Andrew D Bauch,* assistant attorney general, argued the cause, and *Phill Kline,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Joseph "Zeke" Rupnick was charged with three violations of K.S.A. 2004 Supp. 21-3755(b)(1)(C), felony computer crime. The jury found him guilty of lesser included misdemeanor computer trespass under K.S.A. 2004 Supp. 21-3755(d) on Counts I and II and guilty as charged on Count III. Rupnick appeals these convictions. His case was transferred from the Court of Appeals by this court pursuant to K.S.A. 20-3018(c).

Defendant worked for Harrah's Prairie Band Casino in Mayetta from September 1997 until January 2000 and then for Harrah's North Kansas City Casino (Harrah's) in Missouri from February 2000 until January 2001. After leaving Harrah's, defendant began working for the Sac & Fox Casino (Sac & Fox) in Brown County on September 24, 2001.

Before defendant came to work for Sac & Fox, the casino removed all "A" drives for floppy disks from its employee's computers. Thereafter, if employees needed access to work-related data from floppy disks, Sac & Fox computer technicians would load the data onto the Sac & Fox computer system.

Soon after defendant started work with Sac & Fox, agent Darin Altenburg of the Kansas State Gaming Agency was told defendant had asked computer technicians Terry Koppa and Dale Lowe to download suspicious data contained on two floppy disks. Koppa and Lowe scanned the disks to check for computer viruses. During this process, they discovered the disks contained documents labeled as property of Harrah's. The technicians also were able to determine that defendant had not created the documents. They therefore refused to download the data.

Koppa and Lowe reported their findings to their supervisor, Brenda Adkins. Adkins in turn reported the incident to her supervisor, Bill Kendrick, the general manager at Sac & Fox. After the technicians refused to download the data, they noticed that defendant began to bring his personal laptop computer to Sac & Fox.

Altenburg interviewed Adkins about the incident. Adkins told the agent that defendant had also come to her with a black binder containing Harrah's accounting procedures, accounting checklists, policies, and other documents and forms. Adkins said defendant told her to look at the binder and make copies of anything she could use. Altenburg did not know whether the documents contained in the notebook were marked confidential.

Kendrick told Altenburg defendant had said Sac & Fox could benefit from the use of some of Harrah's internal controls. Defendant then passed out copies of Harrah's internal controls to all Sac & Fox department heads. Defendant also showed Kendrick a copy of a confidentiality agreement he had signed at Harrah's and suggested Sac & Fox institute a similar agreement.

The confidentiality agreement defendant had signed at Harrah's contained the following statements:

"I agree that any work, invention, innovation, idea or report that I produce in connection with my work for the Company, or which results from or is suggested by the work I do for or on behalf of the Company is a 'work for hire,' and will be the sole property of the Company.

"I will not at any time, directly or indirectly, either during my employment or for two years thereafter, disclose to any person, corporation or other entity which offers any product or service which is, in any way, in competition with any product or service offered by the Company, or use in competition with the Company, any of the Company's confidential or proprietary information.

"Upon the termination of my employment for any reason whatsoever, I will promptly deliver to the Company all documents, computer software, files, databases, drawings, prints, prototypes, models, manuals, letters, lists, notes, notebooks, reports and copies thereof, whether prepared by me or others, all other material of a secret, confidential or proprietary nature relating to the Company's business, and any other document relating or referring to such material." ·

Altenburg interviewed defendant at Sac & Fox. When Altenburg and another agent, Randy Evans, approached defendant, defendant requested that they speak in defendant's office. Defendant also requested that the agents close the door. Altenburg noticed that a laptop was on defendant's desk; the laptop was connected to a printer, and the printer was printing documents.

Altenburg informed defendant that he and Evans were conducting an investigation. Defendant responded, "Oh, yeah. I heard from somebody that you were investigating me."

When questioned about the computer disks given to the technicians, defendant said he did not have any disks containing Harrah's information. Defendant also maintained that he had not asked the technicians to install such information on the Sac & Fox system. Defendant said he had asked the technicians to install a compact disk containing only minimum internal controls for Indian gaming, which are available to the public on the gaming agency's website. Defendant continued to deny requesting the installation of Harrah's information after Altenburg said he had spoken to the computer technicians personally. Altenburg then asked specifically whether defendant had given the technicians two floppy disks to install. Defendant said he had given them a couple of disks, but the technicians refused to install the data they contained. Defendant stated the technicians told him "it would be an electronic crime or something." When asked why it would be an electronic crime, defendant responded, "I don't know. Something about it was illegal for me to have these disks."

Altenburg then returned to the topic of the information contained on the two disks. Defendant responded that the disks contained information he received while working for Harrah's, including policies and procedures and operation plans. Defendant also stated that he helped design the minimum internal controls and

that he had maintained copies of those documents at his personal residence. Altenburg asked defendant if he remembered signing a confidentiality agreement with Harrah's. Defendant said he did not remember signing such an agreement.

Altenburg then asked defendant if there was any proprietary information belonging to Harrah's on the laptop in defendant's office. Defendant responded, "I'm not going to lie to you guys, I have a lot of shit on my computer from Harrah's. I created a lot of databases when I worked for Harrah's Prairie Band when I was the Surveillance Director, I still have all of those databases. I made them, so in my opinion, they belong to me." When asked what "a lot of shit" meant, defendant replied, "I just have a lot of shit from Harrah's. Some of it's promotional shit, and some of it's maybe stuff I shouldn't have."

Defendant denied Altenburg access to his laptop, stating he did not use the laptop for work purposes. He later admitted, however, that he did use it for work. When asked again, defendant again denied access to his laptop, stating there was information on the laptop that defendant did not want Altenburg to see. Altenburg left defendant's office, contacted his superior, and decided to seize the laptop immediately. Altenburg thought the information contained on the laptop could be destroyed easily and might never be recovered if he did not act quickly.

When Altenburg returned to defendant's office, defendant was on the telephone with an attorney for the casino. Defendant informed the attorney that the agents wanted to take the laptop. The attorney asked why, and defendant responded, "Well, I have stuff from Harrah's on it." The attorney asked, "You have stuff from Harrah's on your personal laptop?" Defendant responded, "I have a lot of shit from Harrah's on my laptop. I have a lot of numbers and everything else."

At that point, Altenburg seized the computer, two compact disks, and a floppy disk, which was not one of the floppy disks defendant had given to the technicians. The laptop was transported to Shawnee County. Altenburg obtained a search warrant to search the contents of the laptop from a magistrate judge who is a resident of Wabaunsee County, and the search warrant was executed in Shaw-

nee County. Captain Gaylon Thompson of the computer crime unit in Shawnee County reported to Altenburg that he retrieved several dozen documents proprietary to Harrah's from defendant's laptop. The two compact disks and the floppy disk seized with the laptop did not contain information from Harrah's.

The director of finance at Harrah's testified at Rupnick's trial that two of the documents found on the laptop were confidential and that Rupnick would not be allowed to leave Harrah's with similar documents in his possession if his employment were terminated, even if he had created the documents originally. A Harrah's controller testified that player lists and financial information found on defendant's laptop were confidential. This was true, she said, although the documents were not marked "confidential" or "proprietary."

The State charged defendant with three felony counts of computer crime under K.S.A. 2004 Supp. 21-3755(b)(1)(C). Counts I and II were based on the information contained on each of the floppy disks given to the technicians. Count III was based on the data found on the laptop.

The defendant unsuccessfully challenged the district court's territorial jurisdiction, claiming there was no evidence he had accessed the computer files in Kansas. Defendant also sought suppression of the statements he had made to Altenburg. The district court rejected defendant's motion to suppress, ruling there was no evidence the statements were involuntary.

Defendant also argued that all evidence obtained from the laptop should be suppressed because the laptop was seized illegally and the search warrant was issued by a magistrate judge from a judicial district other than the one where the warrant was executed. The district judge ruled that exigent circumstances supported the seizure of the laptop; a single keystroke could have deleted evidence. The district judge also ruled that the search warrant was proper in form and that there was sufficient probable cause to support its issuance, saying there was no showing the magistrate was "anything but . . . unbiased and detached . . . when he issued" the warrant.

At trial Rupnick requested and was granted a jury instruction on the lesser included offense of misdemeanor computer trespass under K.S.A. 2004 Supp. 21-3755(d). He also requested the PIK Crim. 3d 59.64-A defense instruction, which the district judge denied.

The jury found defendant guilty of the lesser included offense of misdemeanor computer trespass on Counts I and II, and of felony computer crime on Count III.

### Seizure of Laptop

Defendant argues the district judge erred in refusing to suppress evidence regarding the data on his laptop, because the laptop was seized in violation of the Fourth Amendment. Defendant asserts he did not voluntarily give the laptop to Altenburg, who had no warrant.

When reviewing a district judge's decision on a motion to suppress evidence, we determine only whether the facts underpinning the decision were supported by substantial competent evidence; we do not reweigh the evidence. Our review of the ultimate legal conclusion drawn from the facts by the district judge is de novo. See *State v. Vandervort*, 276 Kan. 164, 169, 72 P.3d 925 (2003).

Rupnick is correct that the Fourth Amendment prohibits unreasonable searches and seizures, and a warrantless seizure is per se unreasonable unless it falls within a recognized exception. See *State v. Canaan*, 265 Kan. 835, 840, 964 P.2d 681 (1998) (citing *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 [1967]).

The recognized exceptions to the warrant requirement for searches and seizures include consent, search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances, the emergency doctrine, inventory searches, plain view or feel, and administrative searches of closely regulated businesses. See *State v. Mendez*, 275 Kan. 412, 420-21, 66 P.3d 811 (2003) (quoting *State v. Baughman*, 29 Kan. App. 2d 812, 814, 32 P.3d 199 [2001]).

Here the State argues that probable cause plus exigent circumstances existed to support seizure of the laptop, relying on *State v. Platten*, 225 Kan. 764, 594 P.2d 201 (1979).

In *Platten*, police officers conducted a warrantless entry into the defendant's home and arrested him. They made the entry because they feared destruction of evidence from a drug buy that had just occurred in the home. As they approached the house, they heard movement inside, and the occupant refused to respond when they knocked and yelled "police officers." *Platten*, 225 Kan. at 766.

The defendant filed a motion to suppress evidence seized from his person and, later, after issuance of a search warrant, from his home. The district court granted the defendant's motion, and the State appealed.

This court was asked whether the circumstances were sufficiently urgent to permit the officers to enter a suspect's residence to effect a felony arrest for which there was probable cause but no warrant. *Platten*, 225 Kan. at 767. Holding that "exigent" circumstances were required, the court enumerated the following nonexclusive factors from the Second Circuit's opinion in *United States v. Reed*, 572 F.2d 412 (2d Cir. 1978), for review in deciding whether such circumstances existed:

"(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) strong reasons to believe that the suspect is in the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended and (6) the peaceful circumstances of the entry." *Platten*, 225 Kan. at 770.

See also *State v. Huff*, 278 Kan. 214, 220, 92 P.3d 604 (2004) (employing the *Reed* factors); *State v. Weas*, 26 Kan. App. 2d 598, 601, 992 P.2d 221 (1999), *rev. denied* 268 Kan. 895 (2000). Although "the possible loss or destruction of evidence" was not an enumerated *Reed* factor, this court said that such loss or destruction also was to be considered in examining whether exigent circumstances existed at the time of a seizure or search. See *Platten*, 225 Kan. at 770.

On the facts of *Platten*, despite the officers' fear of evidence destruction, the court ultimately concluded that exigent circumstances did not exist; it therefore upheld the district court's decision to suppress the evidence seized. *Platten*, 225 Kan. at 770-71. The court emphasized that the burden of proof had been upon the State

to prove the legality of the arrest at issue there and observed that the State had failed to meet that burden. *Platten,* 225 Kan. at 771.

In this case, given defendant's admissions to Altenburg about the data contained on the laptop's hard drive, we have no trouble concluding there was a clear showing of probable cause to seize the laptop, the third of the *Reed* factors to be considered in determining whether probable cause plus exigent circumstances justified a warrantless seizure. The only other relevant factor among those enumerated in *Reed* is the agents' peaceful entry into defendant's office, where they observed the laptop; defendant invited the agents into his office, so this factor also cuts in favor of the State. Finally, as *Platten* instructs, we also consider the potential for destruction of evidence. As the district judge alluded to in his remarks at the time defendant's motion to suppress was decided, at a minimum a keystroke or two could have eliminated all of the laptop's incriminating data, or made it more difficult to reconstruct.

Under these circumstances, we hold that the warrantless seizure of defendant's computer was excused by the exception for probable cause plus exigent circumstances. The district court correctly denied defendant's motion to suppress the evidence from the laptop, insofar as the motion was based on this seizure.

### Necessity of Warrant for Search of Laptop's Hard Drive

On his motion to suppress and again on appeal, defendant further asserts that a valid warrant was required to permit the search of his laptop's hard drive. Because, in his view, no valid search warrant was issued or executed, the evidence from the laptop had to be suppressed.

We have not previously ruled on the threshold issue of whether a law enforcement search of the hard drive of a suspect's personal computer requires a warrant. The Tenth Circuit has addressed the issue in at least two recent cases, and its treatment of it persuades us that a warrant is necessary for such a search unless a recognized exception applies.

In the earlier of the two cases, *United States v. Carey,* 172 F.3d 1268, 1273-75 (10th Cir. 1999), the defendant was arrested in connection with a drug dealing investigation. The police obtained a

search warrant to search the defendant's home. During that search, officers seized two computers they believed would contain drug dealing evidence. An investigator then obtained a search warrant to search the computers' hard drives for evidence "pertaining to the sale and distribution of controlled substances." *Carey*, 172 F.3d at 1270.

While conducting this search, the investigator encountered many computer files with sexually suggestive titles but no files related to drugs. On further examination, the investigator discerned that the files with suggestive titles contained child pornography, and he spent the next 5 hours accessing them. The defendant ultimately was charged with possession of child pornography. *Carey*, 172 F.3d at 1270.

The defendant filed a motion to suppress the child pornography evidence, asserting that, "[d]espite the specificity of the search warrant, files not pertaining to the sale or distribution of controlled substances were opened and searched" in violation of the Fourth Amendment. *Carey*, 172 F.3d at 1272. The government invoked the plain view exception to the warrant requirement, asserting that a computer's hard drive was similar to a file cabinet. Once the government had gained lawful access to the hard drive under the warrant authorizing a search for data related to drug dealing, it argued, law enforcement was empowered to access other files obviously containing data connected to other illegal activity. *Carey*, 172 F.3d at 1272.

In response to these assertions, the Tenth Circuit panel noted that the investigator had admitted he was aware, as soon as he opened the first file with a sexually suggestive title, that no others with similar titles were likely to contain data concerning drug dealing, *i.e.*, the data he had been authorized to seek. Nevertheless, he persisted in opening and viewing the files with suggestive titles for 5 hours. In these circumstances, the panel held, the plain view exception to the warrant requirement did not apply.

" 'Since electronic storage is likely to contain a greater quantity and variety of information than any previous storage method, computers make tempting targets in searches for incriminating information.' [Citation omitted.] Relying on analogies to closed containers or file cabinets may lead courts to 'oversimplify a complex

area of Fourth Amendment doctrines and ignore the realities of massive modern computer storage.' " *Carey*, 172 F.3d at 1275.

The exception for probable cause plus exigent circumstances also did not apply in *Carey*. The officers had already "removed the computers from [defendant's] control . . . . [and] there was no 'exigent circumstance or practical reason to permit officers to rummage through all of the stored data regardless of its relevance or its relation to the information specified in the warrant.' " *Carey*, 172 F.3d at 1275-76.

The *Carey* panel therefore ruled that suppression of the evidence of child pornography on the computers' hard drives was appropriate. *Carey*, 172 F.3d at 1276.

In the second Tenth Circuit case, *United States v. Walser*, 275 F.3d 981 (10th Cir. 2001), *cert. denied* 535 U.S. 1069 (2002), a hotel manager checked on an activated fire alarm in one of the hotel's rooms and discovered two small plastic bags of drugs. The manager called the police. The defendant, who had rented the room, was found in the parking lot, and he told the police that he had set up a computer in the hotel room.

The officers obtained a search warrant for the hotel room and the defendant's car, looking for contraband. In the hotel room, one officer searched the computer hard drive for "ledgers of drug transactions or images of drug use." *Walser*, 275 F.3d at 984. The officer found files containing adult pornography and seized the computer to conduct a more thorough search at the station.

At the station, the officer examined various programs, looking for evidence of drug transactions. During this search, an image appeared on the screen that the officer believed to be child pornography. The officer immediately ceased his search and contacted an agent with more experience in computer forensics and child pornography. The agent advised the officer to obtain a search warrant "specifically authorizing a search for evidence of possession of child pornography." *Walser*, 275 F.3d at 985. The officer obtained the warrant and found additional child pornography evidence; this evidence eventually was admitted at the defendant's trial.

The defendant attempted to prevent introduction of the evidence by arguing that the officer exceeded the scope of the warrant

when he first accessed a file that contained what he believed to be child pornography. The court cited *Carey* for the proposition that

"officers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive. Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the 'intermingling' of documents and a consequent invasion of privacy when police execute a search for evidence on a computer." *Walser*, 275 F.3d at 986.

However, the Tenth Circuit panel was unconvinced by the defendant's argument. It distinguished the activities of the officer in *Walser* from those of the officer in *Carey*. In *Walser*, the officer exercised appropriate restraint by ceasing his search immediately upon opening the first file containing what he believed to be child pornography and obtaining a new search warrant. This compared favorably with the *Carey* officer's exhaustive 5-hour tour of many suspicious files. The distinction justified upholding the introduction of the *Walser* evidence. 275 F.3d at 987.

These cases support defendant's argument that a valid warrant is necessary to search the hard drive of a suspect's personal computer.

In her dissent, the Chief Justice attempts to minimize the persuasive force of *Carey* and *Walser*, primarily by focusing on their factual scenarios. This effort ultimately fails. If, as these cases state, law enforcement is not permitted to expand a warrant-supported search of a computer's hard drive beyond its original scope absent a valid exception to the warrant requirement, then a warrant is normally required for any search of a computer hard drive. See *Walser*, 275 F.3d at 986-87; *Carey*, 172 F.3d at 1273. The general rule cannot be otherwise, given the specific corollary guiding these Tenth Circuit decisions.

In any event, the dissent's extended discussion of whether a warrant is normally required for a search of a computer hard drive is sound and fury signifying little. The Chief Justice ultimately agrees that a warrant must be obtained before such a search is conducted, unless an exception to the warrant requirement applies. We adopt this rule for Kansas; she would do likewise.

In this case, a warrant was obtained. This was appropriate because any exigency evaporated once defendant's laptop was properly seized. The issue then becomes whether the warrant was valid, allowing law enforcement to conduct a search of the laptop's hard drive for incriminating data.

### Validity of Search Warrant

Defendant contends the warrant in this case violated K.S.A. 22-2503. Because this claim requires interpretation of a statute, it raises a question of law reviewable de novo by this court. See *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003).

K.S.A. 22-2503 reads: "Search warrants issued by a district magistrate judge may be executed *only* within the judicial district in which said judge resides or within the judicial district to which said judge has been assigned pursuant to K.S.A. 20-319." (Emphasis added.) K.S.A. 2004 Supp. 20-319 outlines the duties of the departmental justices of our court, including assignment of district judges and district magistrate judges under certain circumstances not applicable here. Thus, in order to comply with the plain language of K.S.A. 22-2503, the search warrant in this case had to be executed in the judicial district in which the magistrate judge was residing. This did not occur. The warrant was executed, *i.e.*, the search of the computers' hard drive was conducted, in Shawnee County in the Third Judicial District, where the laptop had been taken after it was seized from defendant's office. The magistrate who issued the warrant was living in Wabaunsee County in the Second Judicial District.

The State characterizes this failure to comply with K.S.A. 22-2503 as a mere "technical irregularity," relying on the following language from K.S.A. 22-2511: "No search warrant shall be quashed or evidence suppressed because of technical irregularities not affecting the substantial rights of the accused."

We have said that courts prefer "searches conducted under the authority of warrants to those conducted without the benefit thereof" and therefore "warrants and their supporting affidavits are [to be] interpreted in a common sense, rather than a hypertechnical, fashion," *State v. Lefort*, 248 Kan. 332, 335-36, 806 P.2d 986

(1991), but the problem here goes well beyond the merely technical. The label of "technical irregularity" has been reserved for considerably less serious problems in the past. See, *e.g.*, *State v. Collier*, 259 Kan. 346, 367-68, 913 P.2d 597 (1996) (absence of judge's signature on warrant); *Lefort*, 248 Kan. at 337 (warrant failed to include town name but officer familiar with place to be searched). In this instance, the language of K.S.A. 22-2503 could not be more clear or more clearly mandatory. A search warrant issued by this magistrate could only be executed in the Second Judicial District.

Our view is further supported by the history of K.S.A. 22-2503. The predecessor to that provision — K.S.A. 62-1830 (Corrick 1964) — read:

"A warrant shall issue upon affidavit or upon oral testimony given under oath and recorded before the magistrate or judge. If the magistrate or judge is satisfied that there is probable cause for the issuance of a warrant, he shall issue such warrant describing the property to be searched for and seized and naming or describing the person, place or means of conveyance to be searched. The warrant shall be directed to any peace officer of the state of Kansas, or one of its governmental subdivisions who is authorized to enforce or assist in enforcing any law thereof. It shall state the grounds for its issuance, and shall command the officer to search the person, place, thing, or means of conveyance named for the property specified, and to seize such property and hold the same in accordance with the law."

In short, under the previous enactment, "a search warrant issued by a magistrate within the confines of his jurisdiction [could] be served anywhere within the state of Kansas." *State v. Lamb*, 209 Kan. 453, 469, 497 P.2d 275 (1972).

The legislature adopted the current wording of K.S.A. 22-2503 in 1979. L. 1979, ch. 96, sec. 1. " 'When the legislature revises an existing law, it is presumed that the legislature intended to change the law as it existed prior to the amendment.' [Citation omitted.]" *State v. Gordon*, 275 Kan. 393, 405, 66 P.3d 903 (2003). The new statute narrowed the geographical reach of warrants issued by district magistrate judges in Kansas. With no evidence to the contrary, we presume this new restriction on magistrate judge's power was intentional.

Finally, we also observe that "[c]riminal statutes must be strictly construed in favor of the accused. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute." *State v. McGill*, 271 Kan. 150, 154, 22 P.3d 597 (2001). We regard this case as an appropriate one for application of this general rule of lenity. See *State v. McCurry*, 279 Kan. 118, 121, 105 P.3d 1247 (2005). Our interpretation of the plain language of 22-2503 is not only reasonable and sensible; it is virtually inescapable.

We hold that the search warrant was invalid and could not support the search conducted on defendant's laptop. Its execution outside the jurisdiction designated by the statute was not a mere technical irregularity. It affected the substantial rights of the defendant, enabling his conviction on a felony. The evidence from the laptop should have been suppressed by the district judge, whose observation that there was no evidence the magistrate was anything other than fair and unbiased placed the suppression burden on the wrong party and missed the point of defendant's argument. Defendant's conviction of felony computer crime on Count III must be reversed and the case remanded for further proceedings on that charge.

Before leaving this point, we must again pause briefly to respond to the Chief Justice's dissent.

The dissent characterizes the search of the hard drive of Rupnick's laptop as "reasonable" because of the defendant's incriminating statements. Certainly these statements did not constitute consent, and there is no general "reasonableness" exception to the warrant requirement, either under Kansas or federal precedent. See *State v. Baughman*, 29 Kan. App. 2d 812, 814-15, 32 P.3d 199 (2001) (enumerating warrant exceptions and noting aversion to "wild card of general reasonableness"). We decline to adopt a general reasonableness exception in this case.

In addition, as noted above, a computer is not truly analogous to a simple closed container or conventional file cabinet, even a locked one. Rather, it is the digital equivalent of its owner's home, capable of holding a universe of private information. Further, a computer's outward appearance, unlike the containers dealt with in at least some of the cases cited by the dissent, tells the observer

nothing about the content or character of the information or potential evidence contained on its hard drive. In the circumstances of this case, we cannot agree with the dissent's casual willingness to treat the defendant's statements as a blanket waiver of his reasonable expectation of privacy or his implied consent to law enforcement's unlimited access to his laptop's hard drive.

## Vagueness of Felony Statute

Defendant argues that the words "modifying," "altering," and "copying," as used in the definition of felony computer crime in K.S.A. 2004 Supp. 21-3755(b)(1)(C), are unconstitutionally vague. Specifically, he asserts that the "technology of the computer environment is so confusing to the lay person that, without definitions, common people do not understand . . . what constitutes a 'crime' under this statute."

Although we have held above that defendant's conviction for felony computer crime must be reversed because of the invalidity of the search warrant, we address this constitutional claim because of the potential for it to arise if retrial of that charge is attempted.

K.S.A. 2004 Supp. 21-3755(b)(1)(C) defines computer crime as "intentionally exceeding the limits of authorization and damaging, modifying, altering, destroying, copying, disclosing or taking possession of a computer, computer system, computer network or any other property." "Modifying," "altering," and "copying" are not included in the subsection of the statute devoted to defining its terms. See K.S.A. 21-3755(a)(1)-(10).

"Whether a statute is unconstitutionally vague is a question of law over which appellate review is de novo and unlimited." *State v. Armstrong*, 276 Kan. 819, Syl. ¶ 1, 80 P.3d 378 (2003).

"The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt." [Citation omitted.]

"In construing a statute, ordinary words are given their ordinary meaning. [Citation omitted].

"We use a two-part test to determine whether a statute is unconstitutionally vague. First, we consider whether the statute 'conveys a sufficiently definite warning' of the proscribed conduct 'when measured by common understanding and practice.' [Citation omitted.] Next, we consider 'whether the [statute] adequately guards against arbitrary and discriminatory enforcement.' [Citations omitted.] The second part of the test embodies the 'requirement that a legislature establish minimal guidelines to govern law enforcement.' [Citation omitted.]

"As the United States Supreme Court explained in *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972):

'First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'

"A party challenging a statute's constitutionality bears a high burden, but we must remember that 'the standards of certainty in a statute punishing criminal offenses are higher than in those depending primarily upon civil sanctions for enforcement.' [Citations omitted.]" *Armstrong*, 276 Kan. at 821-22.

Having reviewed the governing legal standards, we turn first to a determination of whether the words "modifying," "altering," and "copying," when given their ordinary meanings, convey sufficiently definite warnings of the conduct proscribed by the statute.

Webster's II New Riverside University Dictionary 762 (1988) defines "modify" as "[t]o change in form or character: ALTER." Defendant argues that, as used in this case, modification of an electronically stored document included merely accessing it. This argument ignores ample evidence that defendant went far beyond accessing Harrah's documents and data.

"Alter" is defined by the same dictionary as "[t]o make different: MODIFY." Webster's II New Riverside University Dictionary 96 (1988). Defendant does not specifically address the definition of "alter" in his brief.

"Copy" is defined in the same dictionary as "[t]o make a copy of" or "[t]o follow as a model or pattern: IMITATE." Webster's II New Riverside University Dictionary 310 (1988). Defendant complains that the statute does not differentiate between copying an

entire electronically stored document or cutting and pasting portions of the document into a new document. He is correct that the statute makes no distinction. In fact, it does not speak to copying of "documents" at all, but to copying of "a computer, computer system, computer network or any other property." K.S.A. 2004 Supp. 21-3755(b)(1)(C).

In this case, defendant used portions of the original text of Harrah's electronically generated and/or stored information, *i.e.,* its property, in new documents made to look as though they were authored by him and specific to Sac & Fox. He may have accomplished this in one or more of several ways. Defendant may have picked up all or part of the of the original text and placed it into a new document; he may have read the original text and typed it into a new document; or he may have committed the original text to memory and typed it into a new document. But, any of these methods would have qualified as "modifying," "altering," or "copying," as those words are ordinarily used. The issue is not *how much* of the original was changed or duplicated but whether the original was changed or duplicated *at all.* We are satisfied that these three words conveyed a "sufficiently definite warning" of the conduct proscribed, even in the electronic context, "when measured by common understanding and practice."

We are also called upon to evaluate whether the statute adequately guards against arbitrary and discriminatory enforcement. Again, we disagree with defendant that the absence of statutory definitions of "modifying," "altering," or "copying" makes it "impossible for one to know what is meant." On the contrary, these words have accepted ordinary meanings that are far from completely undone by the advent of computer technology. Both potential violators and potential enforcers of the law should know what to expect and demand. The legislature has established minimal guidelines to govern law enforcement. The statute does not impermissibly delegate basic policy matters to police officers, judges, and juries for resolution on an ad hoc and subjective basis.

At the conclusion of his brief's discussion of this issue, defendant also makes a passing reference to alleged ex post facto application of the statute to his case. He cites no supporting authority. "Simply

pressing a point without pertinent authority . . . is akin to failing to brief an issue;" where a defendant fails to brief an issue, that issue is deemed waived or abandoned. *State v. Gleason*, 277 Kan. 624, 655, 88 P.3d 218 (2004) (citing *McCain Foods USA, Inc., v. Central Processors, Inc.*, 275 Kan. 1, 61 P.3d 68 [2002]).

## Vagueness of Misdemeanor Statute

Defendant also challenges the misdemeanor computer trespass statute, K.S.A. 2004 Supp. 21-3755(d), as unconstitutionally vague. Defendant's two misdemeanor convictions were based on the two floppy disks he gave to Sac & Fox computer technicians. The technicians had returned these disks to defendant after refusing to download the data they contained. They were never found or introduced into evidence.

K.S.A. 2004 Supp. 21-3755(d) reads in pertinent part: "Computer trespass is intentionally, and without authorization accessing or attempting to access any computer, computer system, computer network or computer software, program, documentation, data or property contained in any computer, computer system or computer network."

In particular, defendant complains that the words "accessing or attempting to access" are so vague that persons of common intelligence must guess at their meaning. Unlike the three words in the felony statute with which defendant took issue above, "access" is defined in K.S.A. 2004 Supp. 21-3755(a)(1). According to that provision, "access" means "to instruct, communicate with, store data in, retrieve data from or otherwise make use of any resources of a computer, computer system or computer network." K.S.A. 2004 Supp. 21-3755(a)(1).

Especially given the legislature's care in including a definition, we hold that this statute also survives our two-part test for vagueness. The statute defines the questioned term in a way that gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited; it also provides explicit standards for law enforcement to apply. In this particular case, sufficient testimony supported the State's version of events, *i.e.*, that defendant intentionally and without authorization attempted to "access" or "retrieve

data from" the disks by having the computer technicians download the data to the Sac & Fox computer system. Testimony also supported a reasonable inference that the data on the disks had come from Harrah's and that defendant was no longer authorized to use it.

### Admission of Incriminating Statements

Defendant also argues that the statements he made to Altenburg and Evans should have been suppressed because the agents were conducting a custodial interrogation and did not give him *Miranda* warnings.

Our standard of review on this issue regarding the district court's denial of defendant's motion to suppress is identical to that recited above in relation to seizure of his laptop.

In *State v. Heath*, 264 Kan. 557, 957 P.2d 449 (1998), the defendant voluntarily agreed to be transported for questioning to the police station by police car. The defendant was not restrained in any way or given the *Miranda* warnings. We reviewed the governing law:

"*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), holds that the State may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. [Citation omitted.] However, an officer's obligation to administer a *Miranda* warning attaches only where there has been such a restriction on the suspect's freedom so as to render him or her in custody. [Citation omitted.]

"In determining whether an individual was in custody, the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [Citation omitted.] It does not matter whether the interrogating officers had focused their suspicions upon the individual being questioned if those suspicions are not disclosed to the defendant. Rather, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. [Citation omitted.] This inquiry is made on a case-by-case basis. [Citation omitted.]" *Heath*, 264 Kan. at 590.

Given the voluntary nature of the *Heath* defendant's participation in questioning, this court ruled that he was in not custody at the time and his incriminating statements were permitted to be introduced at trial. 264 Kan. at 591.

In this case, the agents asked if they could speak with defendant. Defendant directed them to his office and voluntarily shut the door. The agents did not tell defendant that he was not free to leave or terminate the interview. Defendant called his general manager and an attorney as questioning progressed. These circumstances constitute substantial competent evidence to support the district court's assessment of the defendant's statements as voluntary. Further, we agree with the district court's implicit conclusion that defendant was not in custody. A reasonable person would have felt free to leave or refuse to answer. Thus the district court's further legal conclusion that *Miranda* warnings were unnecessary also was correct. See *State v. James,* 276 Kan. 737, 749-53, 79 P.3d 169 (2003) (explaining and applying standard of review).

## *Jurisdiction Under K.S.A. 21-3104*

Defendant also asserts the district court lacked territorial jurisdiction over the third count in the complaint, which gave rise to his felony conviction, because there was no evidence he accessed the data on the laptop in Kansas. We address this issue because of its potential to arise again on retrial of this count.

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *State v. James,* 276 Kan. 737, 744, 79 P.3d 169 (2003).

K.S.A. 21-3104 states in pertinent part:

"(1) A person is subject to prosecution and punishment under the law of this state if:

(a) He commits a crime wholly or partly within this state; or

(b) Being outside the state, he counsels, aids, abets, or conspires with another to commit a crime within this state; or

(c) Being outside the state, he commits an act which constitutes an attempt to commit a crime within this state.

"(2) An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state."

We hold the district court had jurisdiction to try defendant on this count. Although there was no direct evidence that defendant placed the Harrah's data on his laptop in Kansas or accessed it there, there was circumstantial evidence to support his "intention-

ally exceeding the limits of authorization and damaging, modifying, altering, destroying, copying, disclosing or taking possession of a computer, computer system, computer network or any other property" in the state. Defendant admitted the laptop contained Harrah's data, and he began using his laptop at work only after the computer technicians refused to download Harrah's data from the two floppy disks he gave them. Defendant also admitted that he used the laptop for work purposes; and Thompson testified that a Harrah's document not authored by defendant was accessed while defendant worked for Sac & Fox and that defendant generated an almost identical document to be circulated in Brown County.

We do not reach defendant's challenge to the sufficiency of the evidence to convict him on the third count or his argument that he was entitled to the PIK Crim. 3d 59.64-A defense instruction, because we are reversing his felony conviction and cannot predict exactly what the evidence against him may be on any retrial.

In accord with the discussion above, the judgment of the district court is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.

GERNON, J., not participating.

LARSON, S.J., assigned.

McFARLAND, C.J., concurring in part and dissenting in part: I agree with the majority that probable cause and exigent circumstances excused the warrantless seizure of the defendant's computer. I further agree with the majority's conclusion that, as a general rule, a warrant is required to search the contents of a computer hard drive.

I disagree, however, that a warrant was required for the search in this case. I would hold that the defendant's voluntary admissions that he had Harrah's documents in his laptop computer effectively revealed the incriminating contents of the computer hard drive, waiving any privacy interest he had in those documents stored in

the computer hard drive. With no expectation of privacy in the documents stored in the hard drive, no warrant was necessary to search for those documents and, thus, the search did not violate the Fourth Amendment. For this reason, I respectfully dissent from that portion of the majority opinion which holds that the invalidity of the warrant requires suppression and, therefore, I dissent from the reversal of the felony computer crime conviction.

The majority relies on *United States v. Carey*, 172 F.3d 1268, 1271 (10th Cir. 1999), for the proposition "that a valid warrant is necessary to search the hard drive of a suspect's personal computer." That is too broad a reading of the holding in that case. *Carey* concerned the permissible scope of a computer search pursuant to a warrant authorizing a search for evidence of a specific type of crime. *Carey* held that when an officer conducting such a search discovers files concerning a crime unrelated to the object of the warrant, the officer must obtain another warrant in order to expand the scope of the search beyond the original authorization. See *United States v. Campos*, 221 F.3d 1143, 1148 (10th Cir. 2000) (search in *Carey* unconstitutional because the officer expanded the scope of the justification for search, thereby engaging in an unconstitutional general search).

The court in *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001), *cert. denied* 535 U.S. 1069 (2002) (discussing *Carey*, 172 F.3d at 1275-76) explained the basis for requiring a second warrant to search a computer hard drive beyond the limited scope of the original search warrant:

"Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the 'intermingling' of documents and a consequent invasion of privacy when police execute a search for evidence on a computer. See [*Carey*, 172 F.3d] at 1275; *see also United States v. Tamura*, 694 F.2d 591, 595-96 (9th Cir. 1982). Thus, when officers come across relevant computer files intermingled with irrelevant computer files, they 'may seal or hold' the computer pending 'approval by a magistrate of the conditions and limitations on a further search' of the computer. *Carey*, 172 F.3d at 1275. Officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant. [*Carey*, 172 F.3d] at 1276."

*Carey* (and *Walser*, which discussed and applied *Carey*) did not hold that a warrant is necessary to search a computer hard drive. In fact, in an unpublished opinion, the Tenth Circuit specifically rejected such a broad reading of *Carey*:

"While Fiscus argues that *Carey* stands for the broad proposition that, absent exigent circumstances, law enforcement may not search a computer without a warrant, our decision in *Carey* merely stands for the proposition that law enforcement may not expand the scope of their search beyond their original justification." *United States v. Fiscus,* 64 Fed. Appx. 157, 164 (10th Cir. 2003) (unpublished).

Further, both the majority opinion and the concurrence stress that the holding is limited to the specific facts of the case. *Carey*, 172 F.3d at 1276 ("[W]e are quick to note these results are predicated only upon the particular facts of this case."); 172 F.3d at 1276 (Baldock, J., concurring) (emphasizing that "the questions presented in the case are extremely close calls and, in my opinion, are totally fact driven").

*Carey* only applies to situations where the search of a computer hard drive exceeds the scope of the original justification for the search. *Carey* does not apply where, for example, officers searching a computer pursuant to a warrant for images of child pornography searched only for images of child pornography, and obtained only such images. See *Campos*, 221 F.3d at 1148. Similarly, in this case, we do not have a situation where officers, straying from the justification for the search, obtained evidence of some other crime. There is no dispute that all of the documents obtained in this search were within the scope of the justification for the lawful seizure, as well as within the scope of the purpose of the search. Thus, *Carey* does not answer the question in this case—whether a warrant was required to search the hard drive of a computer that is in the lawful possession of the authorities.

In answering that question, commentators and other courts have analogized computers to closed containers for Fourth Amendment purposes.

The general rule with respect to closed containers is well settled. An individual has a reasonable expectation of privacy in the contents of a closed container, and therefore, lawful seizure of the container does not permit authorities to open it and examine its

contents without a warrant, or an applicable exception to the warrant requirement. See *cf. California v. Acevedo*, 500 U.S. 565, 114 L. Ed. 2d 619, 111 S. Ct. 1982 (1991) (approving warrantless probable cause search of containers within vehicles); *Horton v. California*, 496 U.S. 128, 141, n.11, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990) (seizure of a container "does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant . . . or one of the well-delineated exceptions to the warrant requirement"); *United States v. Ross*, 456 U.S. 798, 822-23, 72 L. Ed. 2d 572, 102 S. Ct. 2157 (1982); *Walter v. United States*, 447 U.S. 649, 654-55, 65 L. Ed. 2d 410, 100 S. Ct. 2395 (1980) (The fact that agents were lawfully in possession of boxes of film did not give them authority to search their contents as it is well settled that a law enforcement officer's authority to seize a container is distinct from the authority to examine its contents.).

If a computer is considered a closed container, then an individual would have a reasonable expectation of privacy in the electronic information stored in his or her computer hard drive, making a warrant necessary to search the hard drive, unless an exception to the warrant requirement applies. The defendant argued before the district court, and now this court, that for Fourth Amendment purposes, a computer is the equivalent of a closed container. Government publications, commentators, and case law support this analogy.

The United States Department of Justice, in its manual on seizing and searching computers, treats computers as closed containers. See Computer Crime and Intellectual Property Section, Criminal Division, United States Department of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* (July 2002), <http://www.usdoj.gov/cybercrime/s&smanual2002.pdf> (for purposes of determining whether one has a reasonable expectation of privacy in information stored in a computer, computers are analogous to closed containers such as a briefcase or file cabinet).

Additionally, commentators have opined that for Fourth Amendment privacy purposes, computers are considered to be closed con-

tainers. In a 2005 article in the Cardozo Arts and Entertainment Law Journal, Daniel Benoliel summarized the state of the law on this issue:

"In determining whether an individual has a reasonable expectation of privacy in information stored in a computer, under a Fourth Amendment analysis, courts have consistently treated the computer like a closed container, such as a briefcase or a file cabinet. . . . As individuals generally retain a reasonable expectation of privacy in the contents of closed containers, they also generally retain a reasonable expectation of privacy in data held within electronic storage devices. Accordingly, accessing information stored in a computer will ordinarily implicate an owner's reasonable expectation of privacy in the information." Benoliel, *Law, Geography and Cyberspace: The Case of On-Line Territorial Privacy*, 23 Cardozo Arts & Ent. L.J. 125, 131 (2005).

See also Note, *Computer Searches and Seizure*, 48 Clev. St. L. Rev. 185, 189 (2000) (computers are "likely to enjoy the same Fourth Amendment protections as other closed containers"); Baron-Evans, *When the Government Seizes and Searches Your Client's Computer*, 21 No. 24 Andrews Computer & Internet, Litig. Rep. 14 (2004) (in cases where the computer itself is not an instrumentality of a crime, the computer owner has an expectation of privacy in the records stored on the computer separate from that in the computer itself, akin to closed containers).

Further, there is case law support for treating computers as closed containers. See, *e.g.*, *United States v. Barth*, 26 F. Supp. 2d 929, 936 (W.D. Tex. 1998) ("Fourth Amendment protection of closed computer files and hard drives is similar to the protection it affords a person's closed containers and closed personal effects."); *United States v. David*, 756 F. Supp. 1385, 1390 (D. Nev. 1991) (computer memo book treated as a closed container for Fourth Amendment protection purposes); *United States v. Sissler*, 1991 WL 239000 (W.D. Mich. Oct 07, 1991), *aff'd* 966 F.2d 1455 (6th Cir. 1992) (Table), *cert. denied* 506 U.S. 1079 (1993) (upholding seizure and off-site search of computer and disks found during execution of residential search warrant for records of drug transactions because "law enforcement officers are permitted to search any container found within the premises if there is reason to believe that the evidence sought pursuant to a warrant is in it");

*People v. Gall*, 30 P.3d 145, 153 (Colo. 2001) (upholding seizure of laptop computers found in closet during execution of residential search warrant because they were "reasonably likely to serve as 'containers' for writings, or the functional equivalent of 'written or printed material,' of a type enumerated in the warrant"); *cf. United States v. Runyan*, 275 F.3d 449, 458 (5th Cir. 2001) (assuming without deciding that computer disks are "containers," and the defendant had an expectation of privacy in the electronic images stored in the disks).

I am aware of the Tenth Circuit's statement in *Carey*, cautioning that analogizing computers to containers or filing cabinets may " 'oversimplify a complex area of Fourth Amendment doctrines and ignore the realities of massive modern computer storage.' " *Carey*, 172 F.3d at 1275 (quoting Winack, *Searches and Seizures of Computers and Computer Data*, 8 Harv. J.L. & Tech. 75, 110 [1994]). However, that caution was made in the context of the higher risk posed to personal privacy interests if officers, already lawfully "inside" the computer hard drive, are permitted to expand the authorized scope of a computer search into "exploratory rummaging" through intermingled but unrelated files, documents, and images stored in that computer hard drive. *Carey*, 172 F.3d at 1272 (stating the Fourth Amendment requires particularity in a search warrant "to prevent a general exploratory rummaging in a person's belongings"). This same concern is not present when considering the threshold question whether an individual has an expectation of privacy in the contents of the computer hard drive that is separate from the computer itself.

I find the above authorities persuasive and would hold that for purposes of determining whether one has a reasonable expectation of privacy in information stored in a computer hard drive, computers are analogous to closed containers. Accordingly, because a computer owner has a reasonable expectation of privacy in the information stored in his or her computer hard drive, I would hold that, as a general rule, the Fourth Amendment requires a warrant to search the contents of a computer hard drive.

In this case, a warrant was obtained. The majority concludes that the warrant was invalid, and therefore, suppression is required. I

contend that no warrant was required for the search because the defendant's incriminating voluntary admissions revealing the contents of his computer hard drive waived his expectation of privacy in the stored Harrah's documents. With no expectation of privacy violated by the search, there was no Fourth Amendment violation requiring suppression.

The Fourth Amendment is not implicated by a search that does not violate an individual's reasonable expectation of privacy in the object searched. See *Kyllo v. United States*, 533 U.S. 27, 33, 150 L. Ed. 2d 94, 121 S. Ct. 2038 (2001) (quoting *California v. Ciraolo*, 476 U.S. 207, 211, 90 L. Ed. 2d 210, 106 S. Ct. 1809 [1986]) (A Fourth Amendment search does not occur unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable."); *Illinois v. Andreas*, 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 103 S. Ct. 3319 (1983) ("If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause."); *State v. Mudloff*, 29 Kan. App. 2d 1075, 1076-77, 36 P.3d 326 (2001) (individual had no expectation of privacy in use of bathroom stall beyond its intended use; therefore, the warrantless search of the bathroom stall was not unconstitutional).

Although the Fourth Amendment generally protects an individual's reasonable expectation of privacy in the concealed contents of a container, that expectation of privacy is lost when the individual voluntarily reveals the contents of that container to others. On this rationale, courts have held that a suspect's voluntary incriminating admission disclosing the contents of a closed container permits officers to search the container without a warrant.

In *United States v. Cardona-Rivera*, 904 F.2d 1149 (7th Cir. 1990), officers lawfully seized from the defendant wrapped packages that they believed were bricks of cocaine. The defendant was read his *Miranda* rights, and after he waived his rights, the officers asked him what was in the packages. He responded, "[C]oke." 904 F.2d at 1152. The officers took the packages to the federal building where, without a warrant, they opened them and examined and

tested the contents. The packages contained cocaine. *Cardona-Rivera*, 904 F.2d at 1152.

On appeal from the district court's denial of his motion to suppress, the defendant argued that the packages were searched without a warrant "at a time when and place where it would have been easy for the officers to seek a warrant." *Cardona-Rivera*, 904 F.2d at 1155. Judge Richard Posner, writing for the panel, held that the defendant had waived his right to privacy in the contents of the packages, thus obviating the need for a warrant:

"[H]ere the waiver of privacy was direct and explicit. Asked what the packages contained, Luna said 'coke' (he denied this at the suppression hearing, but the judge disbelieved him). He stripped the cloak of secrecy from the package. It was as if he had unwrapped it and pointed. Once Luna admitted that his package contained a contraband substance, no lawful interest of his could be invaded by the officers' opening the packages, whether on the spot or later in their office. No purpose would be served by insisting on a warrant in such a case or by setting aside the conviction because of the absence of a warrant." *Cardona-Rivera*, 904 F.2d at 1156.

Similar holdings can be found in *Commonwealth v. Kondash*, 808 A.2d 943, 949 (Pa. Super. 2002) (The defendant's admission revealing that his closed pouch contained needles was a relinquishment of any expectation of privacy he had therein and therefore, "with no expectation of privacy remaining in the pouch, there can be no constitutional violation associated with its warrantless search."); *State v. Ludtke*, 306 N.W.2d 111, 114 (Minn. 1981) ("[The] defendant, by volunteering what the contents were, had implicitly signaled that he no longer had any expectation of privacy in the satchel. . . . Under the circumstances, we hold [the officer] was justified in searching the satchel without a warrant, even if it may be said that the satchel was the functional equivalent of luggage.").

Although we have not had occasion to adopt this rationale in Kansas, we have recognized that an individual has no constitutionally protected expectation of privacy in information he or she voluntarily conveys to third parties. *United States v. Miller*, 425 U.S. 435, 48 L. Ed. 2d 71, 96 S. Ct. 1619 (1976) (no reasonable expectation of privacy in bank records because the information in the

records had been voluntarily given to the bank, and the records were the property of the bank); *State v. Schultz*, 252 Kan. 819, 834, 850 P.2d 818 (1993) (following *Smith v. Maryland*, 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 [1979] [no reasonable expectation of privacy in phone numbers dialed by owner of a telephone because act of dialing the number effectively reveals the number to the phone company]).

Further, this rule is a natural extension of the United States Supreme Court's recognition that the warrant requirement for closed containers should not apply where the nature of the container permits an inference as to its contents. *Arkansas v. Sanders*, 442 U.S. 753, 764 n.13, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979) (containers which, by their outward appearance, permit an inference as to their contents cannot support any reasonable expectation of privacy), *overruled on other grounds California v. Acevedo*, 500 U.S. 565, 114 L. Ed. 2d 619, 111 S. Ct. 1982 (1991) (approving warrantless search of containers within vehicles on probable cause); see also 3 LaFave, *Search & Seizure* § 5.5(f), pp. 251-60 (4th ed. 2004) (tracing the evolution of the *Sanders* "footnote 13 exception" to cases holding that incriminating admissions revealing a container's contents constitute a waiver of the expectation of privacy).

The Tenth Circuit has followed this trend in *United States v. Corral*, 970 F.2d 719 (10th Cir. 1992). In that case, the court upheld the warrantless search of a lawfully seized opaque container when the circumstances were such that its contents were "a foregone conclusion." 970 F.2d at 725. The court reasoned that an open container, a transparent container, or a container in which its " 'distinctive configuration . . . proclaims its contents' " does not support a reasonable expectation of privacy. 970 F.2d at 725.

The justification for applying the rule from *Cardona-Rivera* is stronger than it is in *Sanders* and *Corral*, for the waiver of privacy in each of those cases requires an inference as to the contents of the container from its outward appearance, while the *Cardona-Rivera* rule requires no inference—the suspect expressly revealed the contents. In fact, in *Cardona-Rivera*, the court held that the defendant's express admission as to the contents of the packages made it unnecessary to determine whether the nature of the pack-

ages allowed an inference as to their contents. *Cardona-Rivera*, 904 F.2d at 1156.

With these authorities in mind, I now turn to the specific facts in the case before the court.

Kansas State Gaming Agent Darin Altenberg was informed that the defendant, a Sac & Fox casino employee, was in possession of proprietary documents of his former employer, Harrah's. Agent Altenberg went to the Sac & Fox casino to interview the defendant. When Altenberg and another agent approached the defendant for the interview, he requested that they speak in his office and asked that the door be closed. When Altenberg told the defendant he was being investigated, the defendant was not surprised, as he had heard he was being investigated.

During the interview the following occurred, as set out in the majority opinion:

"Altenberg then asked the defendant if there was any proprietary information belonging to Harrah's on the laptop in defendant's office. Defendant responded, 'I'm not going to lie to you guys, I have a lot of shit on my computer from Harrah's. I created a lot of databases when I worked for Harrah's Prairie Band when I was the Surveillance Director, I still have all of those databases. I made them, so in my opinion, they belong to me.' When asked what 'a lot of shit' meant, defendant replied, 'I just have a lot of shit from Harrah's. Some of it's promotional shit, some of it's maybe stuff I shouldn't have.'

"Defendant denied Altenberg access to his laptop, stating he did not use the laptop for work purposes. He later admitted, however, that he did use it for work. When asked again, defendant again denied access to his laptop, stating there was information on the laptop that defendant did not want Altenberg to see. Altenberg left defendant's office, contacted his superior, and decided to seize the laptop immediately. Altenberg thought the information contained on the laptop could be destroyed easily and might never be recovered if he did not act quickly.

"When Altenberg returned to defendant's office, defendant was on the telephone with an attorney for the casino. Defendant informed the attorney that the agents wanted to take the laptop. The attorney asked why, and defendant responded, 'Well, I have stuff from Harrah's on it.' The attorney asked, 'You have stuff from Harrah's on your personal laptop?' Defendant responded, 'I have a lot of shit from Harrah's on my laptop. I have a lot of numbers and everything else.' "

Under these facts, the defendant's numerous and repeated voluntary incriminating revelations as to the contents of his laptop computer waived his expectation of privacy in the Harrah's docu-

ments stored in his computer hard drive. With no expectation of privacy in those stored documents, no search warrant was necessary for law enforcement to search his computer hard drive for those documents.

In so stating, I do not intend to imply that the defendant's waiver of his expectation of privacy in the Harrah's documents would have given the officers the right to search the hard drive for anything *other than* the Harrah's documents. Had the officers not limited their search to finding the Harrah's documents, and had they found information such as records of drug transactions or child pornography that then led to prosecution for crimes associated with those records or images, the rationale of *Carey*, limiting the scope of the permissible search in the context of the myriad of highly personal information that may be stored in one's computer, would be highly applicable. This case does not present that scenario.

For the reasons above stated and under the specific facts herein, I would hold that no warrant was necessary for the search for the Harrah's documents stored in the computer hard drive. I would affirm the defendant's felony computer crime conviction.